The Pittsburgh, Cincinnati, and St. Louis R. W. Co. *v*. Nash *et al.*

## THE PITTSBURGH, CINCINNATI, AND ST. LOUIS RAILWAY CO. *v*. NASH ET AL.

COMMON CARRIER.—*Place of Delivery.—Custom.*—Where it is alleged in the complaint against a railroad company on a contract of shipment, and proved on the trial, that it has been the custom of the railroad company to deliver cars loaded with lumber for the plaintiff, at or near the plaintiff's place of business, it is to be presumed that the contract of shipment was made with reference to such custom or usage, and that the railroad company was bound to deliver the cars at the usual place.

SAME.—The liability of a common carrier in the shipment of lumber, coal, or the like, will terminate, in the absence of a contract providing otherwise, when the car containing the same is placed where such articles are usually unloaded, or when the car is delivered at some safe and convenient place designated by the consignee, and notice of such delivery has been given.

SAME.—*Liability for Lumber Destroyed by Fire.*—Where the local agent of a railroad company carrying lumber recognizes the obligation of the company to run the cars to the usual place of delivery, and agrees so to do, but, before the agreement has been carried out, the lumber is destroyed by fire, the company is liable.

From the Lake Common Pleas.

*T. C. Annabal, T. A. Hendricks, O. B. Hord,* and *A. W. Hendricks,* for appellant.

*M. Wood* and *T. J. Wood,* for appellees.

BUSKIRK, J.—The assignments of error call in question the correctness of the ruling of the court below in overruling the demurrer to the complaint and appellant's motion for a new trial. The material averments of the complaint were substantially proved on the trial. The questions presented for our decision are the same. Instead, therefore, of considering the assignments of error separately, we will condense the averments of the complaint and the facts proved.

The appellant had a depot and side tracks at Crown Point for the reception and discharge of passengers and freight. The plaintiffs were partners engaged in the lumber business on one of the side tracks and near to the said depot in said town; that one Jacob Schell was also engaged in the lumber trade in the said town and at the depot aforesaid, and had

his lumber yard near the western terminus of said side track and adjoining the same; that the plaintiffs do business twenty rods east of said Schell's lumber yard and a little north of the same; that the plaintiffs receive all lumber either at the lumber yard of Schell from the cars of the defendant, or at a place on one of the side tracks, about twenty rods east of said Schell's lumber yard, between the two grain warehouses of Z. F. Summers, which place is directly south of the plaintiffs' place of business; that about the 1st of June, 1871, the said Schell went to the city of Chicago to purchase lumber for himself; that the plaintiffs furnished him with money and directed him to purchase for them lumber of a certain quality; that the said Schell purchased said lumber in said city and had the same shipped in his name and with his lumber, to the town of Crown Point, which said lumber was carried on the cars of the defendant, and the cars containing said lumber were run off the main line of the defendant's railroad on the east side track, on the north of said main line of the said railroad, and the agents and employees of the defendant ran up the cars loaded with said lumber of the said Schell and the said plaintiffs to a point on said side track, forty rods east of the lumber yard of the said Schell, and more than twenty rods east of the place where the plaintiffs sometimes received lumber shipped on defendant's road, and near the warehouses aforesaid; that the said lumber arrived at Crown Point and was placed on the side track on Friday night; that the depot agent on the next morning informed the plaintiffs that their lumber had arrived, when they requested him to have the same run up to the usual place of delivery, which he promised to do as soon as he could detach an engine from some passing train; that there was near to the place where the said cars loaded with said lumber were left standing a large hay press, filled with hay, which on Saturday night, by some means unknown to, and without any fault on the part of the defendant, caught fire and was burned up; that the fire was communicated from the burning hay to the lumber on the said cars, by means of

which the lumber of the said Schell and plaintiffs was entirely consumed; and that it was inconvenient and dangerous to unload the lumber from the cars at the point where they were left standing on the said side track.

The question presented for our decision is, whether, under the facts and circumstances stated, the railway company is liable to the plaintiffs for the value of the lumber destroyed. The solution of which question depends upon whether the duty and liability of the defendant as a common carrier had terminated, and the duty and liability of the defendant as warehouseman had commenced, at the time when the lumber was destroyed. If the appellant had performed its whole duty as a common carrier, by placing the cars on the side track, at the place and in the manner stated, then its liability as such had ceased. As the appellant was in no manner responsible for the fire, it is very obvious that it is not liable as warehouseman.

We are referred by counsel for appellant to the following cases in this court, which they insist conclusively show that no liability attaches to the appellant upon the facts stated in the complaint and proved upon the trial: *Bansemer* v. *The Toledo, etc., R. W. Co.,* 25 Ind. 434; *The Cincinnati, etc., R. R. Co.* v. *McCool,* 26 Ind. 140; *The Adams Express Co.* v. *Darnell,* 31 Ind. 20.

In the case first cited, the distinction between the duty and liability of common carriers and those of warehousemen is drawn with great clearness and accuracy. In that and the most of the adjudged cases, the property shipped consists of merchandise, which can be safely stored in the depot or warehouses provided for that purpose. In that case it was said to be the duty of a railroad company to erect depots or warehouses at places where goods are received and discharged, in which they may be safely stored, and to provide agents at such places for the transaction of the necessary business; that such warehouses constitute the proper places of delivery; that the consignees must be presumed to know

that the goods are there discharged, and that it is their duty to receive them at that place.

It was further held in such case that "when the goods have reached their destination, the transit is at an end, and we think that when they are discharged from the cars, and, in the absence of the consignee or his agent to receive them, are safely stored in the warehouse, the liability of the company as a common carrier is then terminated, without notice to the consignee of their arrival. When the goods are thus safely stored, the character of a warehouseman attaches to the company, and as such it is required to keep the goods in store for the consignee for a reasonable time for him to receive and take them away, without additional reward. But, during such time, the railroad company is only liable as a warehouseman, for the want of that degree of care and diligence incident to that relation."

In the quotation made in that case from a leading English case, it is said that the rule applicable to carriage of goods by railroad "determines that they are responsible as common carriers until the goods are removed from the cars and placed on the platform," etc.

In the above case reference is made to a number of adjudged cases where it was held " that so soon as the goods arrive at their destination, or at the terminus of the road, and are unloaded and placed safely and securely in the railroad company's warehouse, the responsibility of the common carrier ceases, and that of warehouseman attaches."

The case referred to in 26 Ind. adheres to the ruling in the above case.

In the case cited in 31 Ind., which was an action against an express company for the loss of a package of money, and where the question was, whether the company was liable as a common carrier or bailee in deposit, the court say:

" It may not be possible always to fix the exact time when the carrier's responsibility as insurer ceases, and when he becomes a mere bailee in deposit or otherwise. But where, as is alleged here, the consignee has notice of the arrival,

and the carrier is ready to deliver, it seems to accord with reason as well as authority that then the liability as carrier ends."

The liability of a common carrier is usually regulated and controlled by the terms of the contract between the parties, but in the absence of any express agreement, the usage and course of business have much weight in determining such liability. Redfield on Railways, vol. 2, p. 61, says:

" But this mode of delivery has no application to the ordinary business of railways as common carriers of goods. The transportation being confined to a given line, according to the ordinary and reasonable course of business, goods must be delivered and received at the stations of the company. And unless they adopt a different course of business, so as to create a different expectation, or stipulate for something more, there is no obligation to receive or deliver freight in any other mode. But where such companies contract to receive or to deliver goods at other places, or where such is the course of their business, they are undoubtedly bound by such undertakings, or by such usage and course of business."

Professor Parsons, in commenting upon the decision of the Supreme Court of Vermont in *Farmers & Mechanics' Bank* v. *Champlain Transportation Co.*, 23 Vt. 186, says: " All the cases, almost without exception, regard the question of the time and place when the duty of the carrier ends as one of contract, to be determined by the jury from a consideration of all that was said by either party at the time of the delivery and acceptance of the parcels by the carrier, the course of business, the practice of the carrier, and all other attending circumstances, the same as any other contract, in order to determine the intention of the parties." 1 Parsons Con. 661, and quoted in 2 Redf. Railways, 62, note 3.

It having been alleged in the complaint and proved upon the trial, that it had been the custom of the appellant, in previous shipments of lumber for the plaintiffs and Shell, to

deliver the cars at or near their places of business, it is to be presumed that the contract of shipment of the lumber in question was made in view of, and in reference to, such custom or usage, and that the appellant was, by such contract, bound to deliver the cars at the place where it had been usual to deliver them. As has been seen, in the shipment of merchandise, the liability of the common carrier does not terminate until the goods are removed from the cars and delivered to the consignee, or placed in the warehouse provided for storing such freight, but we think the liability of the carrier, in the shipment of lumber, coal, or the like, would terminate, in the absence of a contract providing otherwise, when the car containing such lumber, coal, or the like, is placed where such articles are usually unloaded, or when the car is delivered at some safe and convenient place designated by the consignee, and notice of such delivery has been given. Such articles can not be securely stored in a warehouse, nor is it usual for railways to unload such articles. Where the articles shipped are such as cannot be safely deposited in a warehouse, and where the carrier is not required by contract or usage to unload the car, the delivery will be regarded as complete when the car is placed at the usual place of delivery or at some safe and convenient place designated by the consignee, and such consignee has received notice of such arrival and delivery. In such case the car so placed would be the equivalent of the warehouse, and the liability of a warehouseman would attach.

But there seems to be no room to doubt the liability of the appellant as a common carrier, because the local agent of the appellant recognized its obligation to run the cars down to the usual place of delivery, and agreed so to do, but before the agreement was carried out the lumber was destroyed by fire.

We think there was no error committed by the court below.

The judgment is affirmed, with costs.