# VANDALIA RAILROAD COMPANY v. UPSON NUT COMPANY.

[No. 7,802. Filed March 11, 1913. Rehearing denied December 18, 1913.]

1. CONVERSION.— *Acts Constituting.*— A conversion implies some affirmative wrongful act in the disposition of the thing converted, or in withholding it from the rightful owner, that is, there must be a wrongful taking or detention, or an illegal use, misuse, or assumption of ownership, and a mere nonfeasance or failure to perform a duty imposed by contract or implied by law is not conversion. p. 254.

2.  CARRIERS.— *Failure of Delivery.— Conversion.—* A mere nondelivery by a common carrier does not constitute a conversion, but a misdelivery may. p. 255.

3.  CARRIERS.— *Conversion of Freight.— Evidence.— Sufficiency.—* Evidence showing that a carload of iron was received by defendant railroad company to be delivered to the codefendant, that the delivery of the car required the placing of same in the yard of codefendant beyond a gate which was maintained across the switchtrack, the key to which was kept by codefendant, that the car was placed upon the track outside the gate on Friday, was checked by an employe of defendant as inaccessible on Saturday, and removed as empty on Monday, that the purported receipt of codefendant for the car was signed by defendant's conductor, who gave no notice to codefendant that the car was on the siding, that the car never passed within codefendant's gate and that it was never unloaded by codefendant, though failing to show what was the actual disposition made of the iron, while amply sufficient to show a nondelivery of the iron, does not support a finding that it was converted by defendant railroad company. p. 255.

4.  APPEAL.—*Waiver of Error.—Briefs.—*Alleged error in the ruling on a motion for new trial is waived by failure of the party asserting the error to set out the motion in its brief in compliance with Rule 22.  p. 258.

5.  SALES.—*Liability for Price.—Failure to Deliver Goods.—*The purchaser of a car of iron is not liable for its value where there was evidence to support the jury's finding that the goods were never delivered to such purchaser or received by it.  p. 258.

From Superior Court of Marion County (77,515) ; *James M. Leathers,* Judge.

Action by the Upson Nut Company against the Vandalia Railroad Company and another. From the judgment against it, the Vandalia Railroad Company appeals. *Reversed.*

*Samuel O. Pickens* and *Owen Pickens,* for appellant.
*Louis Newberger* and *Charles W. Richards,* for appellee.

IBACH, C. J.—This action was brought by appellee against appellant and the Home Stove Company to recover the value of a carload of pig iron. The complaint was in two paragraphs, the first alleging that the iron was sold to defendants at their special instance and request, and the second declaring on a special contract for the purchase of the iron. Trial

by jury resulted in a verdict for defendant Home Stove Company, and against appellant. Appellant has assigned as error the overruling of its motion for new trial, under which it argues that its motion for a peremptory instruction in its favor should have been sustained, that the evidence is insufficient to sustain the verdict, and that the court erred in giving and refusing to give certain instructions.

It was agreed in evidence that the carload of iron in question was ordered from appellee by the Home Stove Company on October 4, 1907, and was shipped from appellee's plant in Cleveland, Ohio, about October 12, 1907, in a car marked Erie 50361, by the Cleveland, Cincinnati, Chicago and St. Louis Railroad Company to Indianapolis, and arrived at the place where it was to be turned over to appellant for delivery to the Home Stove Company. There was evidence that the iron was never delivered to the Home Stove Company, and the jury so found by its verdict in favor of that defendant. In order to uphold the verdict against appellant railroad company, it must appear that the evidence justified the jury in finding that appellant *converted* the iron in question, for there was no claim that appellant ever contracted to purchase the iron, nor can appellant be held in this action as a common carrier for a breach of its contract to deliver. Under the theory of the complaint, appellant can be held liable only upon the ground that it converted the carload of iron, and that appellee waived the tort and sued upon the implied contract to pay its reasonable value. Therefore, the one question of importance presented by the appeal is, Did the evidence justify the jury in finding that appellant converted the iron in question? Appellant urges that the evidence, construing it as strongly as possible in favor of appellee, shows no more than a failure to deliver, and that a mere failure to deliver is not a conversion. A conversion by a common carrier or other bailee implies some 1. wrongful act, a wrongful disposition, or withholding of the property. There must be an affirmative wrong-

ful act, and mere nonfeasance, or failure to perform a duty imposed by contract or implied by law, is not a conversion.  There must be a wrongful taking or detention, or an illegal use, misuse, or assumption of ownership.  A misdelivery by a carrier may be a conversion, but a mere nondelivery is not.  *Magnin* v. *Dinsmore* (1877), 70 N. Y. 410, 26 Am. Rep. 608; *Bowlin* v. *Nye* (1852), 64 Mass. 416; *Wamsley* v. *Atlas Steamship Co.* (1901), 168 N. Y. 533, 61 N. E. 896, 85 Am. St. 699; *Davis* v. *Hurt* (1896), 114 Ala. 146, 21 South. 468; *Glaze* v. *McMillion* (1838), 7 Por. (Ala.) 279; *Alabama, etc., R. Co.* v. *Kidd* (1859), 35 Ala. 209.

The evidence shows that the iron in question was shipped in a car marked Erie 50361, to Indianapolis, and there turned over to appellant to deliver to the Home Stove Company.  Appellant's sidetrack runs north and south along the side of the Home Stove Company's plant, for about 200 feet until it reaches a gate, entering the Home Stove Company's yard, and from this point the sidetrack runs south into the yard for about 250 feet.  The gate, which extends across the track, was kept locked at all times except when it was necessary to put cars in and out of the yard, and the key was kept in the stove company's office.  It was the custom of appellant to set the cars inside the gate that they might be unloaded, and we may say that the legitimate inference from the evidence is that delivery of cars from appellant to the Home Stove Company was not completed until the cars were taken through the gate and placed ready for unloading.  From the records of appellant placed in evidence it appears that car marked Erie 50361, loaded, was set on the siding north of the gate on October 18, 1907.  On October 19, 1907, the car was checked on that siding by an employe of appellant as inaccessible.  October 20 was Sunday, and the Home Stove Company's plant was idle, and there is not a record of the car on that day.  On October 21, according to the records of appellant, the car

was removed from the siding as empty, was inspected at appellant's yards and recorded as empty, and it is recorded as having been sent out empty in a train on October 23. Appellant's conductor, who placed the car on the siding, admitted that he had signed the initials of the Home Stove Company to a paper purporting to be a receipt for the car from that company on October 18, 1907, and admitted that he had given no notice to any agent or representative of the company when he placed it on the siding. It appears that this was not the first time he had signed the initials of the Home Stove Company, but that he had never signed them with any authority from such company, or any of its agents. All of the several witnesses of the Home Stove Company testify positively that the car never passed within its gate. Its superintendent testifies that the iron was ordered for a special purpose, and he was on the lookout for the shipment, that he passed up and down the siding about five or six times a day, and that it was not on the siding on October 19. The evidence is positive and uncontradicted that the iron was not unloaded by the Home Stove Company on their siding, either to the north or south of the gate. There is no evidence to show what was the actual disposition of the iron.

The jury found in answer to interrogatories that the car was placed by appellant on the sidetrack of the Home Stove Company on October 18, 1907, north of the gate, that no notice was given to any officer or agent of the Home Stove Company after placing it on the siding, that the car was not unloaded north of said gate, and that it was not on October 19, 20 or 21 moved to the south of said gate, and that the car was never accepted by any officer or agent of the Home Stove Company.

What became of the iron seems to have been a mystery to plaintiff, to both defendants, to their counsel, and to the witnesses, and it is a mystery also to the writer of this opinion. But counsel for appellee suggest that the jury adopted as the most reasonable solution of the difficulty, the

theory that the loaded car was set upon the siding, by appellant, and was removed by it loaded. There is evidence to show that the car was set upon the siding loaded, and if this is true, then it must have been either unloaded there, or removed loaded. The jury, it is contended, might have believed that the car was removed loaded. Then, appellee's counsel contended, if appellant removed the car loaded, and later refused upon demand to deliver the iron to the Home Stove Company, there was such a misdelivery and wrongful appropriation and detention of the property by appellant as to constitute a conversion.

However, our view of the evidence is not the same as that of appellee's counsel. The evidence, as detailed above, is amply sufficient for the jury to find that the iron was never delivered to the Home Stove Company. But we do not think it sufficient to show that appellant converted the iron. It appears that the iron was delivered to appellant, and that appellant never delivered it to the Home Stove Company. Such evidence might make out a case of failure to deliver as a carrier, but there is no direct evidence of any positive wrongful act on the part of appellant, inconsistent with plaintiff's ownership, which would constitute a conversion. The signing of the Home Stove Company's initials to the receipt by appellant's conductor alone would not constitute such an act. The most, perhaps, that can be inferred from the evidence is that the iron was lost, and a carrier is not liable for a conversion where goods are merely lost. We do not think that the jury was justified in finding from the evidence that appellant converted the carload of iron, and therefore the court erred in overruling the motion of appellant Vandalia Railroad Company for a new trial, and for that error the judgment must be reversed as to appellant Vandalia Railroad Company.

Appellee Upson Nut Company has attempted to make the Home Stove Company a party to the appeal, and has as-

signed as error against it that the court erred in overruling the separate motion of the Upson Nut Company for a new trial. This error has been waived by failure to set out the motion for new trial in the Upson Nut Company's brief, under Rule 22 of this court. However, upon the evidence, the jury was fully justified in finding that the iron was never delivered to and received and accepted by the defendant Home Stove Company, and consequently it is not liable for its value.

The judgment is affirmed as to the defendant Home Stove Company, and reversed as to appellant Vandalia Railroad Company.

Adams, Lairy, Shea, JJ., Felt, P. J., concur, Hottel, J., dissents.

## DISSENTING OPINION.

HOTTEL, J.—"The one question of importance presented by this appeal" and determined by the prevailing opinion, as stated therein is, "Did the evidence justify the jury in finding that appellant converted the iron in question?" The judgment is reversed on the theory that the question should be answered in the negative. With this conclusion we cannot agree. It is well settled by the decisions of the Supreme Court and Appellate Court of this State that if there be any evidence upon this question which can be said to have warranted the jury in finding or inferring that there was such conversion, its verdict will not be disturbed by this court. It is also well settled that in determining such question, we must look to that evidence alone which is most favorable to appellee.

In dissenting from the prevailing opinion, we feel that we should indicate a part, at least, of the evidence, upon which such dissent is based. By a stipulation of the parties, it is shown that the Home Stove Company's factory and yards are situate adjacent to Kentucky Avenue in the city of Indianapolis and are connected by a stub switch with the Indian-

apolis and Vincennes division of the appellant Vandalia Railroad Company's line; *that this is the only line of railroad over which cars can be gotten into and out of the Home Stove Company's plant and yards;* that the Vandalia Railroad Company's line connects with the line of the Cleveland, Cincinnati, Chicago and St. Louis Railroad Company (commonly known as and called the Big Four) at another point in the city, and that the Cleveland, etc., R. Co.'s road extends from this connecting point to the city of Cleveland, Ohio; that on about October 12, 1907, and after the order for the iron was given and accepted, appellee at Cleveland, Ohio, loaded into Erie car No. 50361 and delivered to the Cleveland, etc., R. Co. for transportation to the Home Stove Company at Indianapolis, Indiana, 50,000 pounds, that is, 22.321 tons pig iron of the kind and quality described and designated in the order; that the car was marked consigned to the Home Stove Company, Indianapolis; that the car with the iron therein arrived at the connecting point of Cleveland, etc., R. Co. and the defendant Vandalia Railroad Company in Indianapolis on or before October 18, 1907.

The following further facts are either conceded or not seriously disputed. The consignee's plant not being on the line of the initial carrier, the car, loaded with the iron in question, on its arrival in Indianapolis, was delivered to and accepted by appellant on October 18, 1907, for delivery to the consignee. The point of the car's receipt by the appellant from the connecting line was at or near a place or switch yard known as the Caven Yard, which was about two miles from the stove company's yards. The stub switch which led from the appellant's track to the Home Stove Company's plant and thence into the latter's yard had a gate across it where it led into the yard. It was the custom of the stove company, well known to, and for several years observed by, the railroad company to receive and unload pig iron only on the inside or south of this gate. This gate was kept locked. It was the practice for the railroad com-

pany's trainmen in delivering cars to the stove company to go to the office, where the gate key was kept, and have some one open the gate to admit the cars and then to procure a receipt for the cars delivered and placed according to custom. Appellant's records, made at the time, and as a part of the transaction, show that it took this car from the Caven Yard on the morning of October 18 and about 9:30 a. m. placed it, with pig iron therein, on the Home Stove Company's switch somewhere to the outside or north of this gate. At the time he made such delivery, appellant's conductor did not obtain the consignee's signature to the customary receipt required by appellant but in lieu thereof, the conductor, without any authority to do so, signed the initials of the consignee to a freight form receipt, which he was accustomed to use as a receipt form in procuring the signature of consignees, and he delivered such receipt to his company and his superiors as and for the consignee's genuine receipt. There is no evidence that appellant or its agents placed this car according to their custom and habit at the usual and proper place for unloading, on the Home Stove Company's switch, and no direct evidence that the car was ever south of the gate or on the inside of the yard.

Delos A. Alig, who went to appellant's offices at the Union Depot at Indianapolis to get some trace of the missing property testified in substance as follows: "* * * I met a clerk there who said he had charge of the records. We went over the records for car Erie No. 50361. I made a memorandum of my investigation. I went with the clerk to make the investigation, and he told me he had looked for the record of the car leaving the switch, but was not able to find it. I went upstairs, where these records are kept, to look for it. We did not find any slip showing car No. 50361, nor the slip now marked 'Exhibit No. 8.' * * * The * * * young man said he had made several searches for the record showing the car being taken off the switch but had been unable to find it. My recollection is

that the slips showing outgoing cars were filed together and the slips showing incoming cars were filed together in the same room. In making my search I looked at a bunch of slips for October, 1907, showing the cars coming out of the switches. * * * I did not find any slip referring to October 18th for outgoing cars. I did not find one for October 19th. I do not remember whether there was a slip for October 20th. *I am positive I saw a slip for October 21st. * * * I did not see the card now marked 'Exhibit No. 8.' I did not find that card in the files and that was what I was looking for. I did not find any card of October 21st in the file purporting to show removal of car 50361 from our switch. I looked for the entire month of October. I made that investigation last spring, about the first of last April. * * * I called Mr. Picken's attention to the fact that there was a link in the chain of evidence out. I told Mr. Davidson that the record was missing. I told Mr. Richards it was missing, of Morris & Newberger. * * ** When I was making the examination at the Union Station I was looking for any report showing the taking of that car off the switch." Exhibit No. 8 referred to in this witness's evidence is the exhibit introduced in evidence by the appellant showing the removal of car 50361 empty on October 21, 1907.

Otto F. Alig, the superintendent of the Home Stove Company, testified in part as follows: "I was the superintendent at that time. There are five doors leading out on the side of the building to the track. I directed the setting of cars on that switch. On the 18th, 19th and 21st of October, 1907, I was along that switch about six to a dozen times a day. On neither of those days did I give any order or direction to any one concerning the setting of this car known as Erie No. 50361. * * * On neither of these days did I see any carload of iron from the Upson Nut Company, being No. 1 Upson iron, either south or north of the gate on the switch. On neither of those days did I see any iron un-

loaded from any car along that switch, either inside or out-side of the gate. So far as I know the car never came on the switch. The car was not on the switch. When a car was placed on our switch in a position where it could not be unloaded we would telephone the Vandalia yard and they would come over and set it. * * *''

Testimony of W. J. Power. ''I am employed at the pres-ent time by the Home Stove Company. I have been em-ployed there five and one-half years. During the month of October, 1907, I was there as time keeper and keeper of car records. * * * I do not remember anything about this car Erie 50361, on the 18th, 19th or 21st day of October. I made true and correct entries of each car on the switch of the Home Stove Company in my car record. I do not remember that on the 18th, 19th or 21st day of October, 1907, Erie car 50361, loaded with Upson No. 1 pig iron, came onto our switch. I examined this switch for this car on these days. * * * On Exhibit No. 6 the 'Inx' oppo-site 50361, Erie, pig iron, is not in my handwriting. I do not know in whose handwriting it is. * * * I made an examination of the switch every morning for cars, * * * about 8:30 * * * inside and outside the gate * * *. When a car of pig iron is put on the outside the gate, for the reason that there are coal cars inside the gate, the engine is called by Mr. Alig to do the switching to get the pig iron inside and unload it. * * * I O K'd the cars on these slips on account of the car service, because of demurrage. When the cars were brought in and not set they were not to be charged demurrage. * * * The Vandalia Railroad Company is the only one that has ever switched or set cars on our switch. I did not see Mr. Corey out there on our switch on the 19th. I did not make a remark to him that this car 50361 was inaccessible.'' Exhibit No. 6 referred to by this witness is an exhibit identified by appellant's witness Corey as a slip or record made by him of cars on Home Stove Company's switch,

on October 19, 1907, and this slip showed car 50361 on the Home Stove Company's switch on said day, the slip contained after the car No. 50361 the letters "Inx" which the witness Corey testified was put on the slip by Mr. Powers and indicated that the car was inaccessible.

George Alig, Jr., testified in part as follows: "* * * I received no information concerning that car other than from Mr. Cash and Mr. Graham, the railroad company's employes. I asked them for records, and got none. I made that investigation with Mr. Power. *I saw the slips marked Exhibits Nos. 6 and 7, and also the cards marked Exhibits Nos. 4 and 8,* there in the Vandalia freight office. *On none of these sheets or cards did I see any information concerning the car Erie 50361.* They did not show me anything to the effect that the Vandalia Company received the car at Caven Yard, nor that the car service man had found the car on the switch one day and the following day removed. They did not show me a slip of the freight conductor to the effect that on a certain day he had hauled the car off the switch empty, or gone out empty with the freight train somewhere else. * * *"

The letters between appellant and appellee and between appellee and the Home Stove Company, introduced in evidence, show that appellant, before the trial, was insisting that it had delivered the iron in question to the consignee. On one occasion, the appellant presented the consignee with its unauthorized receipt for the car, saying "Here is your receipt for this car".

It is conceded in the prevailing opinion and supported by decision of courts of other jurisdictions there cited, that *"a misdelivery by a carrier may be a conversion"*. (Our italics.) Some of these decisions indicate that there may be a misdelivery as to place as well as to person. In the case of *Bowlin* v. *Nye* (1852), 64 Mass. 416, the court said: *"A misdelivery of the goods* by the defendant would have been a conversion of them, and would therefore have ren-

dered him liable in trover; for it would have been an *unlawful act.* * * * But there is no proof of misdelivery in the present case. It does not appear *where or to whom the goods were delivered, if at all, or where they ought to have been delivered.''* (Our italics.) Again, in the case of *Wamsley* v. *Atlas Steamship Co.* (1901), 168 N. Y. 533, 61 N. E. 896, 85 Am. St. 699, the following language is quoted by appellant in its brief: "Trover will lie when goods have been lost to the owner by the act of the carrier, though there may have been no intentional wrong; as when goods are by mistake, or under a *forged order,* delivered to the wrong person. But it will not lie for the mere omission of the carrier; as where the property has been stolen or lost by his negligence, and so cannot be delivered to the owner." See, also, *Pittsburgh, etc., R. Co.* v. *Nash* (1873), 43 Ind. 423, 427, 428.

The facts in this case show that, at the express request of the stove company, appellant had long been in the habit of delivering on its private switch south of, and *inside its gate,* cars consigned to it, loaded with pig iron, as was the one in question, and there getting the receipt of such company from one of its agents, usually the man in whose office the key to such gate was kept. On this occasion, the custom was violated and the car in question delivered north of and outside of such gate. There was no notice given the consignee of such delivery. The usual and customary receipt, required by appellant of its agent upon whom it imposed the duty of making such delivery, was not obtained from the consignee, but in lieu thereof, such agent, without the authority of the consignee, signed its initials to such receipt and this receipt, which was the only written evidence of delivery to the consignee ever required by appellant in such cases, was reported and turned in to appellant according to such usual custom.

Appellant now contends, and the theory of the prevailing opinion seems to be, that these facts merely show a failure to

deliver the property to the consignee and are not sufficient to even warrant an inference of misdelivery. This claim and theory seem to have been recently adopted by appellant. The evidence discloses, that appellant by its correspondence, words and conduct, before trial, was insisting that it had delivered the iron in question to the consignee. Let us examine the evidence with a view of determining whether there is any evidence warranting the jury in inferring that there was a misdelivery, or whether it was of such a character as should have forced the jury, and therefore this court, to conclude that only a failure of delivery is shown. The appellant's conductor who last had charge of the car, was the person upon whom the duty of delivery to the consignee was imposed by appellant. Did he deliver the car with the iron in it? He says so, in effect, at least. It is not disputed by him or by his principal that he set the car on the consignee's private switch. Did he thereby intend a delivery to the consignee? He undoubtedly did, or why did he sign and file with his principal the customary receipt taken from the consignee in such cases, thereby furnishing the only evidence of delivery ever required or obtained in such cases by his principal? Upon this subject such conductor said: *"After delivering the car* it was not convenient and some way or other to get some one to sign for the car *after delivering it.* I signed this myself, just putting 'H. S. Co.' and turned it in. *That is to show Mr. Graham when he got that receipt that the car had been delivered and set. That is the object of this paper.* I was accustomed to use that sort of a form and returned it to the home office upon the delivery of each car to the consignee. It is the customary form for indicating that the car *had been delivered to the consignee.* * * * I did not have any authority to sign the Home Stove Co's. initials to this paper. *It was a part of my duty to deliver a paper of this kind to the consignee and get this signature.* The idea of papers of this kind is *merely to show, or to put on record, that the*

*car has been delivered. It was for the purpose of getting a receipt of the consignee for the delivery of the car."*

This language from the appellant's agent, who last had charge of the car,·and upon whom was imposed the duty of delivering, would seem to be sufficient to warrant at least, an inference by the jury that such agent regarded and treated the car as delivered when he so placed it on the consignee's private switch, and signed the receipt of the consignee therefor. Did appellant, the conductor's principal, receive his receipt for delivery of the car and treat it as evidence of delivery of such car and contents, and afterwards claim and rely on such delivery? If not, why, in all of its correspondence and communications with shipper and consignee before suit, did it claim that it had delivered the property in question to the consignee and why did it present such consignee with a receipt saying, "Here is your receipt for this car". It seems to us that such evidence ought to be sufficient to warrant an inference that appellant thought and acted as though it had made some kind of a delivery. If there was some kind of a delivery, what kind was it? Was it a delivery at the proper place to the proper consignee? The consignee says it did not get the iron and we do not understand that it is now contended that its receipt therefor, admittedly signed without its authority, was sufficient to force the jury to conclude that it did. To us the conclusion is irresistible that the jury had evidence before it, which warranted an inference of misdelivery of the iron in question. Under this evidence, what element of misdelivery is lacking either as to person or as to place? What more could have been, or would have been, required to constitute a misdelivery? That the delivery in question was not at the usual or customary place of. delivery is not disputed. The placing of the car on the switch outside the consignee's gate, with intent to deliver it, in violation of the established custom and understanding between appellant and the consignee, was a wrong delivery or misdelivery

as to place, at least, and we think the evidence also shows or tends to show a misdelivery as to the person to whom the delivery should have been made. Suppose this same conductor and agent of appellant, when he set this car out on the stove company's private switch, thereby intending a delivery to such consignee, had innocently taken the receipt of some stranger to such consignee who had no authority to sign such receipt, and appellant, relying on such receipt, afterwards, on demand, had refused and failed to deliver the iron, would it be heard to say, under such circumstances, that it had not misdelivered the iron? The decisions relied on by appellant would not authorize such a conclusion. Wherein lies the difference and distinction between the assumed case and the case at bar? Does the fact that the stranger signed the receipt in the assumed case, while appellant's agent signed it in the case at bar, make a misdelivery in the one case and a mere failure to deliver in the other case? Is the situation of the parties, so far as delivery is concerned, altered by reason of the fact that appellant's agent, upon whom it had imposed the duty of delivery, while performing such duty, assumed to act and did act, without authority, as the agent of the consignee in accepting delivery? The difference between the two cases is that the stranger in the assumed case acts as consignee and furnishes the forged or unauthorized receipt and evidence of delivery required by appellant of its agent, in such cases, while in the case at bar, appellant's agent to make the delivery, also acts as the consignee's agent in accepting delivery, and, instead of innocently furnishing his principal the consignee's receipt, as in the assumed case, he, knowingly and intentionally, signs and furnishes such unauthorized receipt and evidence of his delivery. This difference is unfavorable rather than favorable to appellant's contention. In the assumed case, appellant would have in its favor the fact that the wrongful delivery to the stranger was innocently and unintentionally made, which would be some reason for

holding that the wrongful and tortious element necessary
in cases of conversion was lacking, while, in the case at bar,
the delivery is robbed of such innocent intent and instead
is tainted with the intentional and wrongful act of the ap-
pellant's agent in signing and furnishing to his principal
the unauthorized and forged receipt of the consignee, as
evidence of his delivery. To hold that the evidence in this
case conclusively shows a failure to deliver only, and that
for this reason there was no conversion of the property in
question, makes it possible for appellant to take advantage
of its own wrong and repudiate its own act of delivery made
by its agent who furnished it the usual and only evidence
of delivery required by it. Characterize the attempted de-
livery of appellant as you will, call it a failure to deliver
or a misdelivery, its acts and conduct as shown by the evi-
dence in this case were of such a character as to justify and
warrant the jury in inferring that it converted the property
in question. This act of appellant's agent in accepting
and receipting for such car after he had placed it on the
consignee's private switch, as and for a delivery to such
consignee, was an exercise of dominion and authority over
the contents of such car, inconsistent with his principal's
possession and control of such property and illegal, wrong-
ful and tortious as against the consignee and shipper, and
therefore, under all the authorities, including those cited
by appellant, constituted a conversion of the property by
appellant. A conversion of property may result from a
mere failure to deliver. *Baltimore, etc., R. Co.* v. *O'Donnell*
(1892), 49 Ohio St. 489, 32 N. E. 497, 21 L. R. A. 117, 34
Am. St. 579; *Clement* v. *New York, etc., R. Co.* (1890), 9
N. Y. Supp. 601; *Hamilton* v. *Chicago, etc., R. Co.* (1897),
103 Iowa 325, 72 N. W. 536; 6 Cyc. 474. An unwarranted
diversion or removal of goods by the transporting carrier
has been held to be a conversion.

In the case of *Baltimore, etc., R. Co.* v. *O'Donnell, supra,*
497, that court said: "Unless the justification was estab-

lished, there appears to have been evidence, as shown by the record, from which the jury might find, as they did, that there was a conversion of the goods by the defendant; for, in order to constitute a conversion, it was not necessary that there should have been an actual appropriation of the property by the defendant to its own use and benefit; *it might arise from the exercise of a dominion over it in exclusion of the right of the owner, or withholding it from his possession under a claim inconsistent with his rights.* If one take the property of another, for a temporary purpose only, in disregard of the owner's right, it is a conversion. Either a wrongful taking, an assumption of ownership, an illegal use or misuse, or a *wrongful detention of chattels, will constitute a conversion.* 'Whoever' * * * 'takes upon himself to detain another man's goods from him without cause, takes upon himself the right of disposing of them,' and is guilty of conversion." 6 Cyc. 474, note 62 and cases cited; *Richmond, etc., R. Co.* v. *Benson* (1890), 86 Ga. 203, 12 S. E. 357, 22 Am. St. 446. This doctrine of liability on the implied contract or conversion, applies not only where the carrier or tortfeasor has sold the goods wrongfully but also where he has used or consumed them, *or exercised any sort of unlawful dominion and control over them inconsistent with his duties as a carrier and adverse to the rights of the proper owner.* 15 Am. and Eng. Ency. Law (2d ed.) 1116b; *Wamsley* v. *Atlas Steamship Co., supra; Magnin* v. *Dinsmore* (1877), 70 N. Y. 410, 417, 26 Am. Rep. 608; *Bowlin* v. *Nye, supra.*

The act of the carrier in failing to deliver without lawful excuse may constitute a conversion, and the consignee after waiting a reasonable time and after demand, may bring his action therefor. *Baltimore, etc., R. Co.* v. *O'Donnell, supra; Clement* v. *New York, etc., R. Co., supra; Hamilton* v. *Chicago, etc., R. Co., supra;* 6 Cyc. 474. This court in the case of *Cleveland, etc., R. Co.* v. *Wright* (1900), 25 Ind. App. 525, 527, 58 N. E. 559, held "that evidence of a demand

and a failure to deliver would tend to prove a conversion, and, if unexplained, it would authorize a finding of conversion." We recognize that such demand and refusal are only evidence of a conversion where the defendant was in such condition that he might have delivered the property if he would, and if the undisputed evidence in this case was of such a character as to show that the property in question was lost or stolen, the authorities relied on by appellant would be controlling, but there is no affirmative evidence in this case showing either of such facts, or at least the evidence on this question was not of such a character as to justify this court in saying that the jury was bound to so find.

The evidence is undisputed that the appellant had possession of the property for delivery to the consignee on October 18, 1907. This possession is presumed to continue until the contrary is shown. *Adams* v. *Slate* (1882), 87 Ind. 573, 575; *Abbott* v. *Union Mut. Life Ins. Co.* (1890), 127 Ind. 70, 75, 26 N. E. 153; *Rush* v. *McGee* (1871), 36 Ind. 69.

This court cannot, under the evidence in the record, say that the jury did not have the right to infer that the appellant still had possession of the property when demand was made on it for the same. The only affirmative evidence upon this question is that relied on by appellant as tending to show a delivery to the consignee, and in determining whether the appellant did still have possession of the property when such demand was made upon it for the same, the jury had a right to take into account the evidence introduced before it, which showed or tended to show what became of the property after it went into appellant's possession. In determining whether the decision reached by the jury on this question had any evidence for its support, we should remember that there was some evidence showing or tending to show the following facts: The car in which this iron was loaded was an open Gondola car. There were fifty tons of iron made

up of bars weighing from 120 to 130 pounds each. The appellant's road and track was the only railroad track connecting with the Home Stove Company's private switch. No other railroad had access to such car while it was on the switch. The consignee was advised of the shipment of the car before its alleged arrival and some of its officers and employes were on the lookout for it. Such officers and employes, some of whom passed up and down the switch, six to a dozen times a day, claim they never saw the car either north or south of the gate, and one of such employes stated positively that such a car loaded with the kind of iron in question, was not on the switch on the days claimed by appellant. The consignee had no way of setting cars for unloading, and when they were set north of its gate, it had been its custom to require appellant to set and place such cars at the point desired for unloading. Appellant acquiesced in this custom and placed such cars. The appellant claims to have delivered the car loaded on October 18 and removed it empty on October 21. The 20th of the month was Sunday. There was no affirmative evidence of the loss or destruction of the car, and no one claims to have ever seen the car or any of its contents unloaded or removed, except, appellant claims to have removed the car empty. There is no evidence that the car in question was ever set or placed for unloading by appellant's agents. The conductor, who claimed to have delivered and placed the car loaded on the consignee's sidetrack north of its gate, admitted that he might not have seen the car delivered or placed on the switch; that he might have been somewhere else and entrusted the delivery of this particular car to the other trainmen. The same conductor was unable to say that when he removed the car empty, as he claimed, he got it at a point on the sidetrack where it would have been placed for unloading by the consignee, and was unable to say at what point on the sidetrack he got the car, or that he knew that the car was empty, except by his report. There

are statements in this conductor's evidence seemingly contradictory. He admits that he signed the initials of the consignee without authority to the receipt necessary to be turned in to his principal to show the delivery of the car. There was evidence tending to impeach appellant's record by which it attempted to show the delivery of the car loaded on the private switch of the stove company and the removal of the same car empty. From this evidence, the jury may have properly inferred that the appellant never in fact delivered the car *loaded* on appellant's private switch, or that if it did deliver it there loaded, it afterwards took it out in the same condition. Either inference, in view of the fact that a demand was afterwards made on appellant for such property, would, under the authorities cited in this and the prevailing opinion, authorize the verdict in this case.

NOTE.—Reported in 101 N. E. 114. See, also, under (1) 38 Cyc. 2007; (2) 6 Cyc. 472, 513; (3) 38 Cyc. 2087; (4) 3 Cyc. 388; (5) 35 Cyc. 164, 262, 539.