**INLAND METALS REFINING CO., Plaintiff,**

v.

**CERES MARINE TERMINALS, INC., Defendant.**

**No. 82 C 0839.**

United States District Court,
N.D. Illinois, E.D.

Feb. 11, 1983.

---

**21.** 22 U.S.C. § 3776.

**22.** 28 U.S.C. § 1346(b).

**23.** 28 U.S.C. § 2675(a).

Francis M. Pawlak, Altheimer & Gray, Kenneth R. Gaines, Roger B. Harris, Chicago, Ill., for plaintiff.

Theodore C. Robinson, Ray, Robinson, Keener & Hanninen, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Inland Metals Refining Company ("Inland") brings this two-count diversity action against Ceres Marine Terminals, Inc. ("Ceres"), seeking damages for the loss of metal inventories Inland had stored in Ceres' warehouse:

1. Count I charges "Ceres' failure to redeliver Inland's property, in the absence of any explanation therefor, constitutes a conversion of Inland's lead and zinc" (Complaint ¶ 10).

2. Count II asserts Ceres breached a contractual duty to exercise reasonable care in storing the metal.

Both sides now move for summary judgment. For the reasons stated in this memorandum opinion and order, Ceres' motion is granted as to Count I and the damage issue on Count II,[1] and Inland's motion is granted as to the liability issue on Count II.

### Facts

In almost all respects there is no real dispute as to the relevant events; and any differences that do exist are nonmaterial in legal terms. Between August 3, 1977 and April 1, 1979 Inland delivered large quantities of lead and zinc to Ceres' Portage, Indiana warehouse for safekeeping, paying monthly storage fees of $1.25 per ton. Upon receipt of each lot Ceres gave Inland a form warehouse receipt ("Warehouse Receipt") containing the terms and conditions of the bailment. Warehouse Receipt § 9(a) (captioned "LIABILITY") states:

The warehouseman assumes no liability for any loss or injury to the goods stored which could not have been avoided by the exercise of reasonable care required by law of a reasonably careful man. . . .

Warehouse Receipt § 10(a) (entitled "LIMITATIONS OF DAMAGES AND CLAIMS") provides:

The depositor declares that damages are limited to 200 times the base storage rate, provided, however, that such liability may on written request of the depositor within a reasonable time after receipt of warehouse receipt be increased on part or all of the goods hereunder, in which event a monthly charge of 20 cents per $100.00 of excess value will be made in addition to the regular monthly charge.

At no time did Inland request an increase in Ceres' contractual liability.

From May 1, 1980 through May 23, 1981 Ceres' periodic inventory checks reflected shortages in some of Inland's stored metals:

1. 270 pieces of lead on May 1, 1980;

2. 3 bundles of zinc on August 31, 1980;

3. 31 pieces of lead on April 16, 1981;

4. 2 pieces of lead on May 23, 1981.[2]

Ceres believed "the material was still on hand somewhere in the warehouse itself" and:

that some of the cargo could possibly have been moved to another location within the building, and the person taking the inventory at that time just had failed to pick everything up; therefore, we kept the inventory, as far as storage purposes, the same until that shortage could be verified.

Q. What facts led you to believe that the shortages in this inventory were somewhere else, could be explained by the metals being somewhere else in the warehouse?

A. Well, the inventory could have been taken by a checker who is from the ILA, and they are not always the most responsible type of people. The inventory was taken in May, which is at the start of our

---

1. As reflected in n. 8, although Ceres is right as to the enforceability of the contractual limitation on its Count II liability, its calculation of that limitation is wrong. Inland's is right.

2. No correlation has been furnished this Court between "pieces" and "bundles" and the weight of the metals involved. It does however appear from the sheer numbers that the initially observed shortage represented the bulk of the total shortages.

shipping season, again which is very busy and is very hectic, and they might have moved some of that material to make room for cargo coming off of the vessels. So at that time, we felt that there would be no adjustments made on the storage invoices until such time as it could be verified.

Ceres' Assistant Manager Richard Suranovic ("Suranovic") Dep. 32–33. Accordingly Ceres did not notify Inland of the situation.

It was Inland's May 1981 request for the return of its metals—made about a year after the first apparent shortage had been reported to Ceres—that resulted in a confirmation the shortages were real. At that point Ceres advised Inland.

Ceres attributes disappearance of the metals to theft by unknown individuals (and has submitted a theft report to the Indiana State Police).[3] Inland speculates Ceres converted the metals either deliberately (for its own use) or inadvertently (by misdelivery). Neither side has proffered any solid evidentiary support for its explanation.

### Current Motions

In its summary judgment motion, Inland seeks the full value of the lost metals, contending as a matter of law Ceres committed either conversion or negligence (for which it is assertedly contractually liable).[4] Inland

also urges (1) principles of equitable estoppel bar Ceres' invocation of Warehouse Receipt § 10(a)'s damages-limiting provision and (2) Ind.Code § 26–1–7–204(2) (corresponding to UCC § 7–204)[5] renders that provision unenforceable as to losses caused by the warehouseman's acts of conversion.

Ceres' motion seeks summary judgment on Count I, emphasizing Inland's failure to adduce any evidence of Ceres' wrongful disposition of Inland's property. As for Count II:

1. Ceres claims Suranovic's deposition testimony, which outlined the general security precautions taken at its Portage warehouse, created an issue of fact.

2. Ceres also calls on Section 10(a) to restrict its liability if it were held negligent.

There is just one respect in which the parties' positions are not polar opposites. They agree that Illinois' choice-of-law rules look to Indiana law for the rule of decision on every legal question.

### Count I

Despite the applicability of Indiana law, Inland places its Count I reliance on *I.C.C. Metals, Inc. v. Municipal Warehouse Co.,* 50 N.Y.2d 657, 431 N.Y.S.2d 372, 409 N.E.2d 849 (1980) and a federal case following that New York decision. *I.C.C. Metals* holds proof of (1) delivery of the bailed goods to

---

**3.** Suranovic's answers to Inland's first set of interrogatories conjecture that longshoremen and delivery personnel (who are hired on a daily basis) probably filched the warehoused metals piece by piece. That theory is predicated on three contentions:

1. Pilferage by such individuals is a long standing problem plaguing all terminal companies.

2. "The bundles of pieces are too large to be moved except by forklift vehicles but when the bundles are accidentally or intentionally broken the individual pieces are small and light enough to be placed in car and truck cabs trunks and are stolen before daily work requirements permit rebinding of the bundles and the thefts are not discovered until periodic inventories are carried out or goods to be shipped cannot be located."

3. There are no discrepancies in the delivery records.

But such "evidence," viewed in the light most favorable to Ceres, shows no more than the possibility (scarcely proof) of theft.

**4.** That latter assertion is not literally true. Rather than affirmatively establishing a "reasonable man" standard of conduct, Warehouse Receipt § 9(a) disclaims any liability for losses *not* occasioned by negligence (or a fortiori by conversion). Count II is thus a tort (not a contractual) claim sounding in negligence.

**5.** That Section provides (emphasis added):

*Damages may be limited by a term in the warehouse receipt* or storage agreement limiting the amount of liability in case of loss or damage, and setting forth a specific liability per article or item, or value per unit of weight, beyond which the warehouseman shall not be liable .... *No such limitation is effective with respect to the warehouseman's liability for conversion to his own use.*

the warehouseman and (2) the warehouseman's failure to return them upon proper demand establishes a prima facie case of conversion (thereby rendering any liability-limiting provision ineffective). That prima facie case can be overcome only upon proof of some alternative explanation for the goods' disappearance. Inland concludes summary judgment (which was granted in *I.C.C. Metals*) is therefore warranted, given Ceres' inability to proffer enough support for its theft hypothesis to create an issue of material fact.

■ Ceres retorts in effect that *I.C.C. Metals* could carry the day were Ceres' warehouse in New York, but Indiana law is to the contrary. In *Vandalia Railroad Co. v. Upson Nut Co.*, 55 Ind.App. 252, 101 N.E. 114 (1913) an iron manufacturer turned over a load of iron[6] to the railroad company for shipment and delivery to the purchaser of the iron. Though no delivery took place, the evidence failed to illuminate what actually happened to the shipment.

Against that background the court (55 Ind.App. at 254–55, 101 N.E. at 114–15) began its analysis with a brief discussion of the gravamen of conversion:

A conversion by a common carrier or other bailee implies some wrongful act—a wrongful disposition or withholding of the property. There must be an affirmative wrongful act; and mere nonfeasance or failure to perform a duty imposed by contract or implied by law is not a conversion. There must be a wrongful taking or detention, or an illegal use, misuse, or assumption of ownership. A misdelivery by a carrier may be a conversion; but a mere nondelivery is not.

Under those principles the court reversed the jury's verdict against the defendant carrier. Its language might well have been written for this case (55 Ind.App. at 256–57, 101 N.E. at 115):

There is no evidence to show what was the actual disposition of the iron....

\* \* \* \* \* \*

What became of the iron seems to have been a mystery to plaintiff, to both defendants, to their counsel, and to the witnesses, and it is a mystery also to the writer of this opinion.... The evidence, as detailed above, is amply sufficient for the jury to find that the iron was never delivered to the [purchaser]. But we do not think it sufficient to show that [the railroad company] converted the iron. It appears that the iron was delivered to [the railroad company], and that [it] never delivered it to the [purchaser]. Such evidence might make out a case of failure to deliver as a carrier; but there is no direct evidence of any positive wrongful act on the part of [the railroad company], inconsistent with [the bailor's] ownership, which would constitute a conversion.... The most, perhaps, that can be inferred from the evidence is that the iron was lost; and a carrier is not liable for a conversion where goods are merely lost. We do not think that the jury was justified in finding from the evidence that appellant converted the car load of iron, and therefore the court erred in overruling the motion of [the] Railroad Company, for a new trial, and for that error the judgment must be reversed as to [the] Railroad Company.

In short, under *Vandalia* the absence of any evidence as to the iron's actual disposition exonerated the defendant of liability for conversion as a matter of law. That holding places the evidentiary burdens of going forward and of proof on the bailor: It must establish conversion as the explanation for the failure of the bailee to return the entrusted goods.

Despite its vintage *Vandalia* still represents the law in Indiana. Indeed 6 Ind.L.E. Conversion § 13, at 344 & n. 18 acknowledges its current vitality. It must be recalled that the UCC statutory test is whether there has been a warehouseman's "conversion to his own use"—and Inland has

---

**6.** Ironically all three cases involved in the discussion—*I.C.C. Metals, Vandalia* and this one—involve large quantities of disappearing

metals. As with the stage magician, a vanishing elephant is far more impressive and mysterious than a disappearing coin.

advanced nothing to indicate Indiana would depart from its common-law (and common-sense) reading of that concept in construing the liability-limitation clause of the UCC. Because Inland introduced "no direct evidence of any positive wrongful act" on Ceres' part, Ceres is entitled to summary judgment on Count I.

### Count II

▪ Indiana's approach to negligence in the bailor-bailee context differs sharply from the conversion doctrine just discussed—it essentially tracks the *I.C.C. Metals* analysis. To establish a prima facie case of negligence, the bailor (here Inland) need only demonstrate the goods were delivered to but not returned by the professional bailee (here Ceres). *See General Grain, Inc. v. International Harvester Co.*, 142 Ind.App. 12, 16, 232 N.E.2d 616, 618 (1968). Then the bailee must "show that the loss or damage was caused without his fault." *Id.* It is unclear whether this evidentiary requirement saddles the bailee with the burden of persuasion or merely that of production. At the very least, however, it obligates the bailee to supply some evidence of the circumstances of the loss.

▪ In those terms Inland has presented a prima facie showing of negligence, triggering Ceres' obligation to disclose how the metals vanished. But Ceres has not responded by meeting its evidentiary burden. It has merely tendered a few sentences of deposition testimony suggesting the reasonableness of its general security measures. Suranovic Dep. 38.

Needless to say, that meager showing falls far short of discharging Ceres' burden of production, let alone any burden of persuasion it must assume. And this is so notwithstanding the concept that reasonable factual inferences are drawn in favor of the party opposing summary judgment. *Accord, I.C.C. Metals,* 50 N.Y.2d at 664 n. 3, 431 N.Y.S.2d at 376 n. 3, 409 N.E.2d at 853 n. 3 (granting summary judgment under parallel circumstances).

Accordingly Inland is entitled to summary judgment as to liability under Count II.

It remains only to determine to what extent, if any, Warehouse Receipt § 10(a) limits Inland's recovery of damages.

▪ Under UCC § 7–204(2) (enacted in Indiana as Ind.Code § 26–1–7–204), the damage-limiting clause of a warehouse receipt is generally enforceable in negligence actions. Inland however insists Ceres is equitably estopped from invoking Warehouse Receipt § 10(a). It reasons (Inland Mem. 6–7):

> Defendant's failure to advise Inland of these losses over a year's time and its simultaneous rendering of storage charges based upon a complete inventory had the effect of inducing Inland to leave its remaining property in Defendant's warehouse, thereby eliminating its opportunity to reduce its actual losses (by removing all of its inventories from Defendant's warehouse at the earliest possible date).

Indiana's version of equitable estoppel is conventional. As *Kline v. Kramer,* 386 N.E.2d 982, 987 (Ind.App.1978) teaches:

> The doctrine of equitable estoppel is invoked when the following circumstances are present: (1) a false representation or concealment of material facts made with actual or constructive knowledge of the true state of facts; and (2) the representation is made to one who is without knowledge or reasonable means of knowing the true facts with the intent that he or she will rely upon it; and (3) the second party must rely or act upon such representation to his or her detriment. *Sheraton Corp. of Am. v. Kingsford Packing Co., Inc.* (1974), 162 Ind.App. 470, 476, 319 N.E.2d 852, 856. For silence to give rise to the application of the doctrine, there must not only be an opportunity to speak, but an imperative duty to do so. *Erie-Haven, Inc. v. First Church of Christ* (1973), 155 Ind.App. 283, 292, 292 N.E.2d 837, 842.

Two aspects of Ceres' conduct are claimed to constitute the requisite "false representation or concealment": its failure to apprise Inland of the apparent inventory

shortage, and its continued billing for storage charges based on the book inventory figures rather than the interim physical count. Neither suffices to satisfy the first prerequisite for equitable estoppel.

■ As for Ceres' failure to notify Inland of the shortages, that cannot operate as a "concealment of material facts" unless Ceres had an affirmative disclosure obligation. But the routine inventory checks that indicated the possibility of losses were too equivocal to trigger "an imperative duty" to speak. As will be recalled, under the circumstances Ceres simply believed (and nothing shows that to have been an unreasonable belief, particularly given its security system) the metals had been shifted within the warehouse or simply missed in the inventory count. Nor did those interim checks indirectly spawn disclosure responsibilities by obligating Ceres to investigate further until the actual disposition of the missing metal was conclusively determined. There is no showing at all the parties contemplated Ceres would conduct any inventories before Inland ordered return of the metals.

■ Ceres' continued use of the original inventory weight to compute monthly storage charges similarly fails to satisfy the first condition of the *Kramer* equitable estoppel formulation. While arguably a

"false representation or concealment," such conduct was not undertaken "with *actual* or *constructive* knowledge of the true state of facts."[7] It is uncontroverted (Suranovic Dep. 32–33) Ceres had no actual knowledge the metals had been taken from the warehouse until it actually had to return the lots to Inland. And absent a duty to make further inquiries, Ceres certainly cannot be charged with constructive knowledge.[8]

Thus both branches of Inland's argument fail. Ceres is not equitably estopped from asserting Warehouse Receipt § 10(a) as a limitation of Inland's damages.

### Conclusion

■ There is no genuine issue of material fact on either of the two counts. Ceres is entitled to a judgment as a matter of law on Complaint Count I. As for Count II, Inland is entitled to a judgment as a matter of law as to Ceres' liability. But Warehouse Receipt § 10(a) (also as a matter of law) restricts Inland's recovery on Count II to $4,654.13.[9] Consequently Count I is dismissed with prejudice, and final judgment shall be entered in favor of Inland for $4,615.13 on Count II.

7. This same point applies with equal force to the alleged concealment discussed in the preceding paragraph of the text.

8. Even were Inland able to overleap the hurdles on the first element of equitable estoppel, it would face major problems on the reliance component of the doctrine. First, its claimed detrimental reliance could not possibly have extended to the first discovered shortage (which was apparently far more costly than the aggregate of the other three losses). No matter how quickly it might have been apprised, Inland could not have altered that fait accompli. Second, it is far from clear that prompt notification of the first loss would have induced Inland (as it claims) to withdraw all its supplies from Ceres' warehouse (thereby forestalling the other three losses). Indeed although some of Inland's tin had vanished from Ceres' warehouse on a prior occasion—a loss that occurred (and was litigated) well before the arguable detection of the first loss at issue here—Inland

continued to store *additional* metals at the warehouse. Nonetheless, because both matters discussed in this note pose factual issues (though the first would deprive Inland of virtually all the benefits of equitable estoppel in any case), this opinion has not been grounded on them.

9. Section 10(a) limits Inland's recovery to 200 times the "base storage rate." Each warehouse receipt imposed a monthly charge of $1.25 per ton of stored material. Inland is right in arguing the "base storage rate" is $1.25 times the weight in tons (here 18.6165 tons) of the lost metals. Ceres' argument for a $500 limitation, based on the $1.25 figure alone multiplied by two lots of merchandise (irrespective of their quantity, measured by weight), is absurd—both as a common sense matter and under the very case law it cites: *World Products, Inc. v. Central Freight Services, Inc.*, 222 F.Supp. 849, 852 (D.N.J.1963).