**Hugh T. ADAMS**

v.

**RYAN & CHRISTIE STORAGE, INC., Ryan & Christie Transit Corp.**

Civ. No. 82–0172.

United States District Court, E.D. Pennsylvania.

Feb. 23, 1983.

William J. Furber, Jr., Norristown, Pa., for plaintiff.

James C. Stroud, Philadelphia, Pa., for defendants.

## OPINION OF THE COURT

LOUIS H. POLLAK, District Judge.*

The issues in this case can, I think, be simply stated, although their resolution in a sense is not simple for the reason that there was no controlling Pennsylvania authority with respect to the issues.

The case is a diversity matter. The plaintiff's father deposited with defendant warehouse a substantial quantity of items for storage, most especially including carpets apparently of considerable value. That was back in 1955. Within a year the senior Mr. Adams had died and the plaintiff, his son, upon whom these items in storage had now devolved, over the course of years added substantially to what was in storage and occasionally removed certain items. It was noted on the original warehouse receipt that the deposit was in a particular so-called Vault No. 4 in Building No. 2.

The matters giving rise to litigation arose when in 1980 the plaintiff, on coming to look at what was in storage, discovered that certain carpets he had seen there in 1977, in the vault—a vault which, incidentally, had never been locked shut—were not there. When questioned, none of defendants' officers or employees were able to supply any information with respect to the missing carpets, and a formal letter of inquiry produced no response.

There is no controversy with respect to the absence of a number of stored items. The controversy before the court relates solely to the measure of compensation.

The goods were originally stored, and supplementary storage evidently followed the same pattern, under receipts which contained in small but not indecipherable language a limitation of liability on the part of the warehouse to thirty cents per pound. Although the original Mr. Adams and his son, the plaintiff, were authorized to provide for more substantial coverage, that is, a higher ceiling on liability, by paying to defendant some additional premium, this was at no time undertaken. The claim by plaintiff is that under the facts in this case, facts that I have summarized and to which the parties have stipulated, the thirty-cents-per-pound limitation should be regarded as inapplicable, and defendant should be required to reimburse plaintiff at the actual value of the items that have been lost.

The framework for the case is section 7204(b) of chapter 72, volume 13, of Purdon's title 13, which recites:

Damages may be limited by a term in the warehouse receipt or storage agreement limiting the amount of liability in case of loss or damage, and setting forth a specific liability per article or item, or value per unit of weight beyond which the warehouseman shall not be liable; provided, however, that such liability may on written request of the bailor at the time of

---

* This is a modestly edited version of an opinion delivered in Chambers on February 23, 1983.

To the extent of any discrepancies, this version is to be taken as the court's opinion.

signing such storage agreement or within a reasonable time after receipt of the warehouse receipt be increased on part or all of the goods thereunder, in which event increased rates may be charged based on such increased valuation, but that no such increase shall be permitted contrary to a lawful limitation of liability contained in the tariff of the warehouseman, if any. No such limitation is effective with respect to the liability of the warehouseman for conversion to his own use.

Now, plaintiff's theory is that this is a case falling within the closing sentence of the section that I have just read: "No such limitation is effective with respect to the liability of the warehouseman for conversion to his own use."

The parties are at one pursuant to stipulation that nobody in fact knows, or at least nobody within the range of this judicial process knows, what happened to the lost goods. It is the position of the plaintiff, however, that the burden is on the warehouseman, whose access to the relevant information must generally be regarded as superior to the information available to the bailor, to come forward at least as an initial matter with some explanation of what has happened to the lost goods if the warehouseman is to avoid the inference that he has converted the lost items to his own use, as opposed to the inference that the items were simply lost through the negligence of the warehouseman, in which case the stipulated thirty-cents-per-pound liability would apply.

The parties agree that there is no body of Pennsylvania case law that leads unerringly in one direction or another. The present issue, so far as the diligence of counsel can fetch up what is relevant, simply appears not to have arisen in Pennsylvania. The issue has arisen elsewhere, and until recently the prevailing authority seemed to be reflected in, as a quite recent example, the Florida decision of *Sanfisket, Inc. v. Atlantic Cold Storage Corp.,* 347 So.2d 647, an appellate decision of vintage 1977. There the court concluded that a loss which was unexplained by the warehouseman gave rise to an inference of negligence but not of conversion.

In 1980 the New York courts brought an end to what seemed to be the even tenor of authority of which *Sanfisket* was an example with the litigation entitled *ICC Metals, Inc. v. Municipal Warehouse Co.,* 50 N.Y.2d 657, 431 N.Y.S.2d 372, 409 N.E.2d 849.

There the New York Court of Appeals affirmed judgments of the trial court and the Appellate Division which found for the plaintiff—where no explanation whatsoever was offered by the warehouseman—that the appropriate inference was conversion and hence a loss of insulation from liability above the particular amount stipulated in the warehouse receipts. The thrust of Judge Gabrielli's rather extended opinion was that the warehouseman had superior sources of information, and that if the warehouseman could be confident that nonexplanation would result simply in liability up to the stipulated amount and not beyond, those in the warehouse business would be encouraged beyond sloppiness to dishonesty, that is, the dishonesty encapsulated in the term "conversion." To this decision Judge Jasen dissented strongly, but alone.

The New York Court of Appeals decision has been relied on in a 1981 decision of the Second Circuit, *Philipp Brothers Metal Corp. v. S.S. "Rio Iguazu,"* 658 F.2d 30, at page 32, but when analyzed, the reliance, if you will, comes down to a mere citation of what was said in *ICC Metals.* The distinction between negligence and conversion was not operative in the Second Circuit's case so as to make it important for the Second Circuit to come to rest on that issue. Conversely, it would, of course, be the case that if the Second Circuit did have a case before it in which the question was, what is the New York law?, it would, of course, be obliged to follow the decision of the New York Court of Appeals in *ICC Metals.*

Plaintiff urges us to conclude that the courts of Pennsylvania when faced with this issue would follow the New York Court of Appeals. Defendants argue that Penn-

sylvania courts would hold with what has certainly been the prevailing range of decision and reject Judge Gabrielli's analysis.

The Pennsylvania courts, as I have suggested, have not addressed or even come to the edges of the particular issue. The Pennsylvania cases make clear, however, that the concept of conversion which prevails in Pennsylvania is the accepted concept, a concept a long distance from negligence. Judge Aldisert has had a recent occasion to encapsulate this, speaking for the Third Circuit in *Baram v. Farugia,* 606 F.2d 42. At page 43 he said, "We ... are satisfied that conversion under the common law of Pennsylvania may be conceptualized as follows: Conversion is an act of willful interference with the dominion or control over a chattel, done without lawful justification, by which any person entitled to the chattel is deprived of its use and possession."

Given that definition of a willful tort and the requirement of 7204(b) that no such limitation is effective with respect to the liability of the warehouseman for conversion to his own use, I think that the Pennsylvania courts would go slowly in attributing an inference of conversion—which not really borders on but certainly in most instances would be criminal conduct—to a civil defendant merely on the basis of the civil defendant's not coming forward with any explanation of the cause of a loss, where absent any such explanation the record would be nonindicative whether negligence or some advertent hostile disposition constituting conversion would be a proper explanation.

I think such reluctance would be the stronger where the UCC requirement is not merely of conversion but conversion by the warehouseman "to his own use." There might after all be numerous instances in which the loss of the bailed goods would be caused, to be sure, not by the negligence of the warehouseman but by conversion, and yet it would be a conversion not embraced within the quoted UCC language, because the conversion would be by persons other than the warehouseman, and one would, I

think, be rather slow in coming to the conclusion that it was the intention of the Pennsylvania Legislature that the warehouseman would be found liable beyond the stipulated liability in the category of cases which in fact reflected neither conversion to the warehouseman's own use nor negligence, that is to say, a perfectly attentive and faithful warehouseman from whose dominion some of the bailed goods were stolen by a third party.

These observations seem to me to be strengthened insofar as they point against plaintiff's position by some further aspects of the matter. What we are dealing with is, of course, a situation in which the bailor can if he wishes stipulate to a liability higher than the liability that appears in the form warehouse receipt by paying some higher premium, that is, within limits the bailor can insure against the risk. In a setting in which the bailor has not done that, and in the event that nobody knows what happened, the question arises, should the bailee be held liable on an attributed theory of negligence which would involve liability up to the stated amount?, or should the limitation on liability be held wholly unavailing and the plaintiff entitled to recover the actual value of goods whose actual value indeed the bailee may not have known at any time until litigation arose?

The inquiry as to assigning the risk of nonpersuasion with respect to an event nobody knows the explanation of has been fairly carefully pursued by Professors White and Summers in their volume on the Uniform Commercial Code, and there is an enlightening discussion on pages 789 to 791 of the pertinent considerations. Let me say as I introduce this that the question Professors White and Summers have been asking is not the question at focus in this case: the negligence-conversion distinction. The question they are asking was the preliminary one, the answer to which seems to be well accepted: Should negligence be attributed to the warehouseman when no explanation is forthcoming? Professors White and Summers are clear that that is where the burden should lie. In many of the cases

negligence cannot be readily proved. When so, the result often depends on who has the burden of producing evidence and who has the ultimate risk of nonpersuasion on the issue of negligence and causation.

Assume the plaintiff introduces credible evidence at trial that he deposited undamaged goods with the bailee, that he instructed the bailee to deliver them up, and that the bailee either failed to deliver any goods at all, delivered only a part of them, or delivered some or all of the goods in a damaged state. Assume the plaintiff then rests without offering evidence on how the loss or damage occurred and without offering evidence on whether the cause of the loss was traceable to the warehouseman's negligence. Has the plaintiff made out a *prima facie* case sufficient to get him to the jury, or is he subject to nonsuit or directed verdict for failure to offer credible proof of negligence and causation?

J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 20–3, at 789–90 (2d ed. 1980).

The editors go on to approve a process in which it then becomes incumbent on the warehouseman to assume "an *initial* burden of producing evidence on the issues of negligence and causation." *Id.* at 790. Then White and Summers go on to ask what happens if the plaintiff then introduces conflicting evidence? If the jury is in equipoise on the question of negligence and causation, then, White and Summers ask, who wins? Who, in short, bears the ultimate risk of nonpersuasion on the issues?

It is manifest that White and Summers think the answer should be that the warehouseman bears the burden of nonpersuasion on these issues, and by the same token would bear the burden of coming forward in a situation in which the plaintiff rested after simply showing the loss, and that White and Summers think that for the generally accepted reason that the warehouseman's information is expected to be the more complete. What the editors are troubled by is that some states have enlarged 7403 by what the editors regard as an inappropriate expansion. 7403 generally provides, in the pertinent part, 7403(a)(2), in Pennsylvania's formulation, that "The bailee must deliver the goods to a person entitled under the document . . . unless and to the extent that the bailee establishes any of the following: . . . [d]amage to or delay, loss or destruction of the goods for which the bailee is not liable. . . ." That formulation, the editors clearly feel, is a formulation which properly puts the burden of showing nonliability—nonnegligence, for the editors' purpose—on the bailee. What White and Summers are distressed about is that a number of states, thirteen, I believe, have added to the statutory language: "but the burden of establishing negligence in such cases is on the person entitled under the document." That language, the editors tell us, is language which is wrong in policy terms, is "inconsistent with a substantial body of pre-Code case law," and in general if followed would make a hash out of any sensible construction of the Code. White & Summers, *supra*, at 791.

Now, it is evident that what White and Summers apprehend is that in a state which has such an appendage to its 7403(a)(2) there would be a real danger that a court properly following that language would assign the risk of nonpersuasion on the issue of negligence to the bailor or other person entitled under the document rather than to the warehouseman, and I think we can agree that that would be an inappropriate result.

Pennsylvania is one of the thirteen states that has that extra language, so it is one of the group of states which in the White and Summers view needs to be strongly cautioned against giving that language the construction which it would seem to bear. If that language were given the construction which White and Summers are concerned about, it could well mean that in a case such as we've got there would be a real question whether with no proof from either party we should wind up in nonsuiting the plaintiff; at least it would cause great doubt as to whether it would be appropriate to draw an inference of negligence on the

defendant's part. I am not prepared to say that a Pennsylvania court would so read this language, but it does seem to me that given the place of that language in our Code, it makes it all the more unlikely that the Pennsylvania courts would go so far as to follow the New York Court of Appeals in *ICC Metals* in drawing an inference of conversion where the warehouseman came forward with no explanation.

Now, having said all that, I must for the sake of completeness and candor make the further acknowledgement that among the states which has this addition to 7403(a)(2) which White and Summers regret, New York is numbered, so that the decision in *ICC Metals* by the New York Court of Appeals was made in the face of—I think "in the teeth" is the proper phrase—in the teeth of exactly such language. In my view that fact only goes to cast some further doubt on the wisdom of the New York Court of Appeals in reaching the result it did, but that, of course, leads me to an essentially impertinent judgment, since whatever my competence may be as a trial judge to try to figure out what the law of Pennsylvania might be in a case where the Pennsylvania appellate courts have not spoken, I guess nobody has authorized me to set myself up as a critic of the New York Court of Appeals' construction of its Uniform Commercial Code. However, I think I can say that the analytic difficulties that seem to me present in *ICC Metals* would when considered by the Pennsylvania courts be recognized as strong reasons why the Pennsylvania courts would be unlikely to follow the New York Court of Appeals.

I point out in this connection that the Note writer in St. John's Law Review, in surveying the law of New York of 1980—the particular Note writer being Mr. Cubita—while finding in the *ICC Metals* decision some salutary practical impact insofar as it would cause warehousemen to be even more careful than they otherwise would be, nonetheless expressed some doubts as to the merit of the decision from an analytic point of view. I refer to 55 *St. John's Law Review* 203, at 209–10.

All of the considerations which I have canvassed lead me to the conclusion that when the Pennsylvania courts address this issue they will come to the conclusion that where the record is silent as to the actual disposition of the bailed goods, and that silence includes not even an attempt by the bailee to offer an explanation, the permissible inference is one of negligence but not one of conversion, with the result that the stipulated-for limitation of liability will be held by the Pennsylvania courts to be effective.

With that conclusion as to the likely course of Pennsylvania law in mind, I determine that with respect to the case before me plaintiff is entitled to recover from defendants for negligence which would be measured by the stipulated liability of thirty cents per pound and nothing in addition to that.[1]

---

1. I have not lost sight of the alternative ground pressed by plaintiff for piercing the thirty-cents-per-pound limitation of liability. That alternative ground is that the record in plaintiff's view shows that the bailed goods or some of them were moved from the vault in which they were to be placed. The record does show that in 1980 Mr. Adams did not find in the vault carpets that were there three years before. However, as I review the relevant law, I conclude that the bailee's liability hinges on his failure to keep goods in the place in which they were supposed to be only where the record demonstrates that placing the bailed goods somewhere else causes a loss: for example, a loss by fire that follows a removal of bailed goods from a fireproof storage locker into an unprotected area. Those conditions aren't met here. Indeed, all the record shows is that there came a point in 1980 when Mr. Adams could not find the bailed goods that he was interested in where they used to be and were supposed to be. That's the very premise we started with, bailed goods which were mislaid, whether inadvertently or otherwise, and it adds in no way to our knowledge of how they were mislaid, so that it does not in my view change the result on the issue considered in the foregoing analysis.