**FERREX INTERNATIONAL, INC.**

**v.**

**M/V RICO CHONE,\* etc., et al.**

**Civ. No. HM–87–52.**

United States District Court,
D. Maryland.

Sept. 9, 1988.

---

\* As docketed; the actual name of the vessel is "M/V Rio Chone".

James D. Skeen and Stephen F. White, Wright, Constable & Skeen, Baltimore, Md., for plaintiff.

Alan C. Cohen, John T. Ward, Quinn, Ward & Kershaw, and Manfred W. Leckszas, Ober, Kaler, Grimes & Shriver, Baltimore, Md., for defendants.

## MEMORANDUM

HERBERT F. MURRAY, District Judge.

### I. *Introduction*

In this case, Ferrex International, Inc. ("Ferrex"), is suing the vessel M/V RIO CHONE; Transportes Navieros Ecuatorianos, trading as Ecuadorian State Lines ("TNE"); Flota Bananera Ecuatoriana, S.A. ("FBE"); and Clark Maryland Terminals, Inc. ("Clark"). TNE and FBE are foreign corporations engaged in the business of carriage of goods by sea and are the owners, operators, or managers of M/V RIO CHONE. Clark is a Maryland corporation and performs the services of a terminal operator in the Port of Baltimore.

The essential facts of this case are not in dispute. Ferrex delivered three packages of welding electrodes to Clark at Dundalk Marine Terminal, Pier 4 on April 2, 1986. The packages were intended to be loaded on the RIO CHONE for export to Ecuador. Clark issued a dock receipt for the merchandise, the terms of which will be more fully described below. When the RIO CHONE arrived at Pier 4 on April 11, 1986, Clark was unable to locate Ferrex's welding rods. There is no evidence as to what happened to the goods, though Clark believes they might have been stolen from the public shed in which they were stored, or that another stevedoring company mistakenly loaded them aboard another vessel which was berthed at Pier 4 just before the RIO CHONE.

To arrange the details of the shipment of welding rods, Ferrex engaged the services of Jahrett Shipping, Inc. ("Jahrett"), a freight forwarder. A freight forwarder typically makes all the arrangements for dispatch of goods to a foreign port, including arranging space on a cargo ship with a steamship company, arranging transportation to the ship and any necessary interim storage, and preparing shipping documents such as the dock receipt and the bill of lading. *See United States v. Ventura,* 724 F.2d 305, 306 (2d Cir.1983); *New York Foreign Freight Forwarders & Brokers Ass'n v. Federal Maritime Commission,* 337 F.2d 289, 292 (2d Cir.1964), *cert. denied,* 380 U.S. 910, 85 S.Ct. 893, 13 L.Ed.2d 797 (1965). In engaging in these activities, freight forwarders act as agents of the shipper. *U.S. v. American Union Transport,* 327 U.S. 437, 443, 66 S.Ct. 644, 647–48, 90 L.Ed. 772 (1946).

Jahrett, acting as Ferrex's agent, arranged for Hanover Trucking Company to transport the welding rods to Clark and for subsequent shipment on the RIO CHONE. In addition, Jahrett prepared documentation including the dock receipt and the bill of lading.

Ferrex's complaint alleges negligence and conversion on the part of TNE and FBE, and negligence, breach of a bailment contract, and conversion on the part of

Clark. TNE and FBE have cross-claimed against Clark for contribution and indemnification. The Court has jurisdiction in admiralty over this case, *see* 28 U.S.C. § 1333(1); with respect to Clark, the Court's jurisdiction is based on diversity of citizenship, *see* 28 U.S.C. § 1332(a).

Now pending before the Court are cross-motions for partial summary judgment. Ferrex has moved for partial summary judgment on the issue whether Clark's liability for the welding rods is limited by a tariff of the Baltimore Marine Terminal Association ("BMTA"). Clark is a member of the BMTA. The tariff in question purports to limit the liability of BMTA members to $500 per package of goods unless the owner declares a higher value and pays a premium of one percent of the declared value. Ferrex claims that it had as a matter of law neither constructive nor actual notice of the liability limitation provision and is therefore not bound by its terms.

Clark has moved for partial summary judgment on the grounds that the dock receipt prepared by Jahrett, which was signed and returned to Ferrex by Clark, limits Clark's liability to $500 for each of the lost packages.

Finally, FBE and TNE have moved for partial summary judgment on the grounds that their liability is limited to $500 per package under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. §§ 1300–1315, as well as by the issued dock receipt and the bill of lading which would have been issued for the goods had they been loaded aboard the RIO CHONE.

The Court has considered the written submissions of the parties and heard oral arguments on February 19, 1988. The Court is now prepared to rule. Each of the motions will be considered in turn.

## II. *Ferrex's Motion for Partial Summary Judgment*

Ferrex argues that the BMTA tariff filed with the Federal Maritime Commission does not put Ferrex on constructive notice of the limitation of liability provision set forth in the tariff. Therefore, Ferrex contends that it is bound by the limitation provision only if it had actual notice of it. Ferrex further contends that it is clear that there is no actual notice of these terms.

■ The Court agrees that the BMTA tariff does not operate to put Ferrex on constructive notice of the liability limitation provision. "[I]t is well established that the filing of a tariff gives constructive notice only of those terms which are required by law to be filed.... Nothing in the Shipping Act of 1916 ... or in the applicable regulations ... requires a terminal operator to file provisions limiting its liability." *La Salle Machine Tool, Inc. v. Maher Terminals, Inc.*, 611 F.2d 56, 60 (4th Cir.1979) (footnote and citations omitted), *aff'g* 452 F.Supp. 217 (D.Md.1978).

■ Unlike *La Salle*, however, in this case there is a genuine factual dispute whether Ferrex had actual notice of the tariff provision. Clark contends that it was common knowledge in the maritime community that nearly all of Baltimore's terminal operators, including Clark, were BMTA members and that the BMTA tariff contained the $500 per package limitation of liability. Clark further contends that Ferrex's agents, Jahrett and Hanover, knew or had reason to know that Clark would handle the welding rods as terminal operator and that their knowledge should be imputed to Ferrex. Support for these factual averments is offered in the affidavit of David M. Keller, Clark's Administrative Manager.

Given the factual dispute whether Ferrex had notice of the limitation of liability provisions in the BMTA, summary judgment on this issue is inappropriate and will therefore be denied. In any case this issue is moot in light of the Court's disposition of the other pending motions.

## III. *Clark's Motion for Partial Summary Judgment*

In this motion, Clark seeks a judgment that its liability in this case is limited to $500 per package on the theory that this limitation was set forth in the dock receipt and in the bill of lading, which was incorporated by reference in the dock receipt.

Clark maintains that Ferrex was aware of and accepted the terms of the dock receipt and bill of lading because its own agent, Jahrett, prepared the receipt and the bill.

The dock receipt that was issued in this case provides, in pertinent part:

> Any valuation in excess of $500.00 per package or customary shipping unit as provided for in the carrier's regular form of bill of lading shall be declared in writing by the shipper upon delivery to the carrier and stated herein, as well as in the bill of lading, and extra freight paid if required. Nothing in this dock receipt shall operate to limit or deprive the carrier of any statutory protection or exemption of limitation of liability.

It further states that the goods delivered to Clark were "to be held and transported subject to all the terms and conditions maintained in the regular form of bill of lading of the carrier which are incorporated herein and shall be considered a part hereof with the same force and effect as if set forth herein in full." Although a bill of lading was never issued for the missing welding rods—for the obvious reason that they disappeared before they could be loaded aboard the M/V RIO CHONE—one was included in the package of documents prepared by Jahrett.

■ The bill of lading contained a provision limiting the liability of the Carrier to $500 per package "unless the nature of the goods and a higher value shall be declared by Shipper, in writing before shipment, and inserted in this bill of lading, and extra freight paid thereon if required." The bill also contained a so-called "Himalaya clause" which provides:

> Because the Carrier requires the assistance of persons and companies to perform the work and services undertaken by it in connection with the Goods described herein as well as the goods of others, the Master, Officers and crew members of the vessels performing hereunder and the contractors, stevedores, longshoremen, agents, representatives, employees and others used, engaged or employed by the Carrier in the performance of the aforesaid work and services of the Carrier shall each be a beneficiary of this contract and shall be entitled to all exemptions and immunities from and limitations of liability which the Carrier has under this bill of lading, whether written, printed or stamped hereon or incorporated by reference herein, and under the United States Carriage of Goods by Sea Act, 1936, and in entering into the provisions of this clause, the Carrier, to the extent of such provisions, does so not only on its own behalf but also as agent and trustee of each of the persons and companies described above, all of whom shall be deemed parties to the contract evidenced by this bill of lading.

By its terms, this clause extends the protection of the liability limitations provision to Clark, which performed stevedoring and other services for the Carrier companies, TNE and FNE. Finally, the bill expressly incorporated the provisions of COGSA and made them applicable before and after loading. The provisions of the bill of lading are applicable even though the bill was never issued. Where an unissued bill of lading is incorporated by reference in an issued dock receipt, its provisions become part of the maritime contract between the parties. *Mediterranean Marine Lines v. John T. Clark & Son,* 485 F.Supp. 1330, 1335 (D.Md.1980).

■ Ferrex attempts to distinguish *Mediterranean Marine* on the theory that that case stressed the availability and certainty of the bill of lading while in this case there is uncertainty about which bill is being incorporated. Ferrex argues that the dock receipt, which incorporates "all the terms and conditions contained in the regular form of bill of lading of the carrier which are incorporated herein," fails to indicate where the regular form of bill of lading is located or where it could be obtained. The Court is unpersuaded. There is no genuine dispute here that Jahrett, Ferrex's agent, prepared the dock receipt and the bill of lading for the shipment.[1] The affidavit of

1. This is not to say that Jahrett drafted the bill of lading. Rather, Jahrett included the bill of lading in a package of documents prepared for

H.A. Gembs, president of Jahrett, and submitted by Ferrex in support of its motion for partial summary judgment, acknowledges that the dock receipt was prepared by Jahrett. Further, Ferrex has never gainsaid Clark's contention that Jahrett also prepared the bill of lading, which omission is particularly glaring in the light of the argument that Ferrex is uncertain about which bill of lading the dock receipt incorporated. The Court therefore concludes that Jahrett prepared both the dock receipt and the bill of lading whose relevant provisions are set forth above. Ferrex cannot now claim that there is uncertainty about which bill of lading was incorporated in the dock receipt when both the bill of lading and the dock receipt were prepared by its own freight forwarding agent. Indeed, Ferrex did not even press this argument at the hearing on cross-motions for partial summary judgment.[2]

The more difficult argument raised by Ferrex is that, under the Maryland Uniform Commercial Code, Clark may not limit its liability for conversion. The Maryland UCC allows a warehouseman to limit its liability for loss or injury by a term in a warehouse receipt or storage agreement. Md.Com.Law Code Ann. § 7–204(2). But "[n]o such limitation is effective with respect to the warehouseman's liability for conversion to his own use." *Id.* Ferrex maintains that Clark is a warehouseman within the meaning of the UCC and that there is a presumption here that Clark converted the goods.

■■■ Before addressing the merits of this argument, the Court must first determine whether Maryland law applies to

these circumstances. As noted above, the bill of lading expressly incorporated the provisions of COGSA. COGSA ordinarily applies only to the period when goods are on board the vessel. *See* 46 U.S.C.App. § 1301(e) ("The term 'carriage of goods' covers the period from the time when the goods are loaded on to the time when they are discharged from the ship."). Nevertheless, COGSA allows parties to a bill of lading to extend its provisions to periods covering "the custody and care and handling of goods prior to the loading on and subsequent to the discharge from the ship on which the goods are carried by sea." 46 U.S.C.App. § 1307. *Accord Mediterranean Marine Lines*, 485 F.Supp. at 1337. As previously noted, the bill of lading, in paragraph 2, makes COGSA's provisions applicable to the period prior to loading on and subsequent to discharge of the goods from the ship.[3] This extension of COGSA's provisions is only contractual, however. "[W]hen COGSA does not apply of its own force but is incorporated into a maritime contract by reference, it does not have 'statute rank'; rather, it is merely part of the contract, a term like any other." *Commonwealth Petrochemicals, Inc. v. S/S Puerto Rico*, 607 F.2d 322, 325 (4th Cir. 1979). Furthermore, an action against a terminal operator for loss of cargo is not within federal maritime jurisdiction, but is a state claim governed by state law. *Colgate Palmolive Co. v. S/S Dart Canada*, 724 F.2d 313, 315 (2d Cir.1983), *cert. denied*, 466 U.S. 963, 104 S.Ct. 2181, 80 L.Ed.2d 562 (1984). Thus, Maryland law applies to Ferrex's action against Clark.

the purpose of proper routing, shipment, and documentation of the welding rods.

2. Ferrex complained in its response to Clark's motion for partial summary judgment that the copy of the bill of lading supplied by Clark with its motion, purporting to be a copy of the terms and conditions standard to each bill of lading issued by the carrier at the time and filed with the FMC, is not certified as such. Ferrex then reserved "the right to produce or request production of a certified copy of the form of bill of lading filed by the ocean carriers with the FMC. . . ." Since that time, nothing further has developed on this issue, either in writing or at

oral argument, so the Court must assume that the issue concerning this uncertainty about the bill has been abandoned.

3. By virtue of the Himalaya clause in paragraph 3 of the bill of lading, this temporal extension of COGSA's provisions inures to the benefit of Clark, which performed stevedoring operations on behalf of TNE and FBE. *See Timco Engineering, Inc. v. Rex & Co.*, 603 F.Supp. 925, 928 (E.D.Pa.1985) (where a Himalaya clause plainly grants stevedores those protections accorded carriers, the courts will uphold such a clause).

The UCC defines a warehouseman as "a person engaged in the business of storing goods for hire." Md.Com.Law Ann. § 7–102(1)(h). Clark contends that as a terminal operator, any storage of goods that it does is simply to facilitate the loading and unloading of goods from vessels and that no one can hire Clark simply to do warehousing for them. The Court is unpersuaded. Virtually all warehousing is by definition temporary, so the fact that Clark stores goods merely to facilitate loading and unloading does not take it out of the definition of a warehouseman. In addition, the UCC recognizes that warehousemen may be engaged in other commercial functions at the same time they perform warehousing tasks. *See id.* § 7–205 (provision regarding warehouseman who is also a dealer in the fungible goods that he stores).

Clark also argues that it does not engage in storage for *hire* because the first seven days of storage at Clark are considered "free time," for which there is no charge. Simply because there is not a separately billed charge for warehousing does not mean that Clark is not paid for storing the goods. Storage of goods is one component of its duties as a terminal operator. There is no question that Clark is paid for terminal operations and its work in this capacity includes storing goods. Therefore, Clark is paid for storing goods notwithstanding the failure to itemize storage charges in its contract with the carrier.

Clark contends that the storage sheds at the marine terminal are not "warehouses," but only covered extensions of the pier. The form of the structure used to store the goods is not determinative of the question whether one is acting as a warehouseman. *See Fireman's Fund Amer. Ins. Co. v. Capt. Fowler's Marina, Inc.*, 343 F.Supp. 347, 350 (D.Mass.1971) (storage outdoors rather than in a building does not mean bailee is not a warehouseman). The facts that Clark rents the storage sheds from the Maryland Port Administration ("MPA") and that the MPA provides the security for the premises is also not controlling. Nothing in the UCC's definition of a warehouseman implies that a warehouseman must own or provide security for the premises in which the goods are stored.

Clark maintains that if it were a warehouseman, the State of Maryland would require Clark to hold a warehouseman's license, pursuant to Md.Ann.Code art. 56, § 176. This section, however, has purposes different from those of the UCC and is not *in pari materia* with the UCC's definition of a warehouseman. Moreover, paragraph 2 of the Official Comment to § 7–102 says: "The warehouseman's compliance with applicable state regulations such as the filing of a bond has no bearing on the substantive issues dealt with in this Title." Whether Clark is required to hold a license for storing goods has no bearing on whether Clark is a warehouseman under § 7–102.

Clark also argues that the document prepared by Ferrex's agent was a dock receipt, not a warehouse receipt and that Maryland law prohibits only limitations of liability through "warehouse receipts" or "storage agreements." But a "warehouse receipt need not be in any particular form." Md.Com.Law Ann. § 7–202(1). Thus, a dock receipt can serve as a warehouse receipt when the goods are to be stored in sheds on the dock, rather than in a warehouse *per se.* Clark contends that all warehouse receipts are documents of title and that because the dock receipt was not a document of title, it cannot be considered a warehouse receipt. Clark's argument is flawed because it is based on the erroneous assumption that a document of title must be negotiable. To the contrary, a document of title can be negotiable or non-negotiable. *See id.* § 7–104. Thus, the fact that the dock receipt in this case is non-negotiable does not make it something other than a document of title. Clark cannot seriously dispute that the dock receipt, within the meaning of the statutory definition of a document of title, is a "document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods

it covers." *Id.* § 1–201(15). Thus, the dock receipt can be considered a warehouse receipt.

■ Having determined that Clark is a UCC warehouseman, the Court must next determine whether Clark is precluded by § 7–204(2) from enforcing the limitation of liability incorporated in the dock receipt.

Ferrex contends that under Maryland law, the facts support a finding of conversion, preventing Clark's enforcing the $500 per package liability limitation. Plaintiff relies chiefly on two decisions rendered by Judge Howard of this Court in the case of *Phillips Brothers, Div. of Engelhard Mineral & Chemical Co. v. Locust Indus.*, Civil No. JH–80–2592. In a Memorandum and Order dated April 22, 1983 ("1983 Decision"), Judge Howard denied the plaintiff bailor's motion for summary judgment on the issue of conversion because the defendant bailee "has provided the Court with more than mere speculation that the goods were lost due to theft for which Locust Industries has not been implicated." 1983 Decision at 12. In a Memorandum and Order dated March 22, 1984 ("1984 Decision"), Judge Howard reaffirmed his 1983 Decision, holding that a bailee must rebut a presumption of conversion by producing more than merely speculative evidence of what happened to the goods but putting the ultimate burden of persuasion on the bailor.

■ Ferrex argues that because it has shown delivery of goods to Clark, the existence of a bailment for hire, and Clark's failure to return the goods, a presumption of conversion arises that, under the authority of Judge Howard's decisions in *Phillips Brothers*, requires Clark to come forth with more than speculation about what happened to the goods. Further, because Clark can adduce no evidence as to what happened to the goods, beyond speculating that they may have been stolen or loaded aboard the wrong ship, Ferrex argues that the Court must find that Clark's actions constituted a conversion, thus precluding the enforceability of the liability limitation provision in the bill of lading.

The Court finds Ferrex's position unconvincing. Though Clark can do no more than offer speculation as to what happened to the goods, the Court is persuaded that the plaintiffs have not presented a prima facie case of conversion. *Phillips Brothers* is not controlling here for two important reasons. First, in *Phillips Brothers* the parties agreed that plaintiffs had set forth a prima facie case for either negligence or conversion. 1983 Decision at 12. No such concession is made here. Second, since the *Phillips Brothers* decisions were rendered, the Maryland Court of Appeals has decided *Commodities Reserve Corp. v. Belt's Wharf Warehouses, Inc.*, 310 Md. 365, 529 A.2d 822 (1987), which defines the prima facie case of negligence and the burdens of proof in bailment cases in a manner that casts doubt on the validity of *Phillips Brothers*.

In *Commodities Reserve*, the Maryland Court of Appeals agreed to consider two questions certified by the United States Court of Appeals for the Fourth Circuit. The first question was:

> What are the respective liabilities of a warehouseman (or bailee) and the owner (or bailor) of property stored with the warehouseman for loss of or damages to such property by reason of the failure of the bailee to return the property at the termination of the bailment in the same condition as it was when delivered to the bailee and, in particular, what is the burden of proof, if any, resting on each (the bailor and the bailee) in establishing the cause of such loss or damage?

*Commodities Reserve*, 310 Md. at 367, 529 A.2d at 822–23. Answering this question, the Maryland Court of Appeals said that, to prove negligence on the part of the bailee,

> [t]he plaintiff's initial burden may be met by proof demonstrating a specific lack of care by the bailee or by evidence sufficient to raise a presumption of some unspecified negligence on the part of the bailee. Under the latter alternative *the plaintiff simply proves delivery to the warehouser of the personal property in good condition and either a failure to return the goods at all, or a redelivery in bad condition.*

*Id.* at 370, 529 A.2d at 824. (emphasis added). As the underscored language indicates, the elements of a prima facie case of negligence in bailment cases are virtually identical to the elements of a prima facie conversion case as set forth in *Phillips Brothers.* This is not particularly surprising, since *Phillips Brothers* derived its formula for conversion cases from a case pertaining to negligence. *See Phillips Brothers* 1983 Decision at 9 (relying on *J. Aron & Company v. Service Transportation Co.,* 486 F.Supp. 1070, 1073–74 (D.Md.1980), which outlined the requirements to prevail on a negligence claim under title seven of Maryland's UCC). To continue to adhere to *Phillips Brothers'* holding on conversion after the definitive pronouncement from the Maryland Court of Appeals on a prima facie negligence case in bailment situations, therefore, would obliterate the distinction between negligence and conversion in bailment cases where the goods are lost and there is no explanation for their disappearance.

 This Court is convinced that the elimination of the distinction between negligence and conversion that would be effected by adhering to *Phillips Brothers* is incompatible with Maryland law. Conversion is an intentional tort that, while not necessarily implicating an improper motive on the part of the tortfeasor, does involve an intent to exercise dominion or control over goods inconsistent with the plaintiff's rights. *Keys v. Chrysler Corp.,* 303 Md. 397, 414, 494 A.2d 200, 208 (1985). No such state-of-mind requirement attends negligence cases. In a Pennsylvania case, the court noted the importance of this distinction in considering whether a bailee could assert a liability limitation in the bailment contract in a case where goods disappeared from the bailee's storage facility and the bailee could provide no explanation for the loss. The plaintiff bailor relied on a provision in Pennsylvania's UCC, identical to the one relied on by Ferrex here, which rendered liability limitations ineffective "with respect to the liability of the warehouseman for conversion to his own use." *Adams v. Ryan & Christie Storage, Inc.,* 563 F.Supp. 409, 411 (E.D.Pa.) *aff'd,* 725 F.2d 666 (3d Cir.1983). The court noted that under Pennsylvania law, conversion is a willful tort and said:

> I think the Pennsylvania courts would go slowly in attributing an inference of conversion ... to a civil defendant merely on the basis of the civil defendant's not coming forward with any explanation of the cause of a loss, where absent any such explanation the record would be nonindicative whether negligence or some advertent hostile disposition constituting conversion would be a proper explanation.
>
> I think such reluctance would be the stronger where the UCC requirement is not merely of conversion but conversion by the warehouseman "to his own use." There might after all be numerous instances in which the loss of the bailed goods would be caused, to be sure, not by the negligence of the warehouseman but by conversion, and yet it would be a conversion not embraced within the quoted UCC language, because the conversion would be by persons other than the warehouseman, and one would, I think, be rather slow in coming to the conclusion that it was the intention of the Pennsylvania Legislature that the warehouseman would be found liable beyond the stipulated liability in the category of cases which in fact reflected neither conversion to the warehouseman's own use nor negligence, that is to say, a perfectly attentive and faithful warehouseman from whose dominion some of the bailed goods were stolen by a third party.

*Id.* 563 F.Supp. at 412.

The Court agrees with the reasoning of the *Adams* court and with its conclusion that "where the record is silent as to the actual disposition of the bailed goods ... the permissible inference is one of negligence but not one of conversion, with the result that the stipulated-for limitation of liability will be held to be effective." *Id.* at 414.

Of course, there are perhaps valid policy reasons for adopting the approach of *Phillips Brothers* and disallowing liability limitation agreements when the warehouseman cannot account for the disappearance of

bailed goods. In *ICC Metals, Inc. v. Municipal Warehouse Co.*, 50 N.Y.2d 657, 431 N.Y.S.2d 372, 409 N.E.2d 849 (1980), the New York Court of Appeals held that proof of delivery of the stored property to a warehouse and the warehouse's failure to return that property upon proper demand is enough to establish a prima facie case of conversion and render inoperable a contractual limitation of liability "unless the warehouse comes forward with evidence sufficient to prove that its failure to return the property is not the result of its conversion of that property to its own use." *Id.* 431 N.Y.S.2d at 374, 409 N.E.2d at 851. In reaching this result the New York court reasoned:

> The same policy considerations which prevent a warehouse from avoiding liability in negligence by a declaration of ignorance appear equally applicable to an action in conversion. Indeed, as a practical matter, a bailor will be even less able to prove conversion by a warehouse than he would negligence, since a warehouseman who actually converts stored property will generally strive mightily to prevent knowledge of his malfeasance from coming to light. The possibility of fraud is obvious, for a dishonest warehouseman might well be encouraged to convert bailed property if he could then obtain the benefit of a contractual limitation of liability by the simple expedient of professing ignorance as to the fate of the goods.

*Id.* 431 N.Y.S.2d at 379, 409 N.E.2d at 855. There is much to be said for adopting a policy designed to deter fraudulent practices but this Court is not now prepared to engraft such a policy onto the Maryland UCC. The Maryland legislature has drawn a distinction between negligence and conversion with regard to a warehouseman's ability to limit his liability for goods entrusted to his care, allowing a limitation for negligence but not for conversion. This distinction would make little difference any time goods inexplicably disappeared if there were no difference between prima facie cases of negligence and conversion because a bailor could merely sue in con-

version and avoid any contractual provisions limiting the bailee's liability.

This last observation suggests why the reasoning of the New York court in *ICC Metals* is ultimately unpersuasive. A bailor such as Ferrex can always protect itself by declaring a higher value for its goods and paying any additional charges required by the bailee to cover the greater risk. No one is forcing Ferrex or any other bailor to accept a limitation of the warehouseman's liability. Concededly, there are competing policies at work here but such policy questions are for Maryland lawmakers, not a federal court. A federal court sitting in diversity is bound to apply state law as it is, not how the court believes it should be. At this time, Maryland law distinguishes between conversion and negligence for purposes of a warehouseman's limiting his liability and that distinction would be obliterated if this Court were to hold that the elements of a prima facie case are the same for both torts.

Accordingly, this Court concludes that Ferrex has insufficient evidence to support a prima facie case of conversion to its own use by Clark and therefore that Clark's liability in this matter is limited to $500 per package of welding rods, for a total of $1500.

## IV. *FBE's and TNE's Motion for Partial Summary Judgment*

 FBE and TNE have moved for partial summary judgment limiting their liability in this case to the $500 per package limitation provided for under COGSA, the dock receipt, and the unissued bill of lading.

The Court finds that any liability of FBE and TNE is limited by COGSA 46 U.S.C. App. § 1304(5). COGSA's provisions were incorporated in the unissued bill of lading which became part of the maritime contract by virtue of being incorporated in the issued dock receipt. *See Mediterranean Marine Lines*, 485 F.Supp. at 1335. Therefore, the Court concludes that any liability of FBE and TNE is limited to $500 per package for a total of $1500.

## V. *Conclusion*

For all the foregoing reasons, the Court will enter partial summary judgment for Clark, FBE, and TNE, limiting their liability to $500 per package. The Court will deny Ferrex's motion for summary judgment. Finally, the Court finds no just reason for delaying the entry of final judgment on the issues decided today. Therefore the Court will direct that judgment be entered on these matters. *See* F.R.Civ.P. 54(b).