**In re SLT WAREHOUSE COMPANY, Debtor.**

**Bankruptcy No. 89–42013–172.**

United States Bankruptcy Court, E.D. Missouri, E.D.

Aug. 9, 1991.

Robert H. Brownlee, Michael J. Morris, Jeanne Early Poe, St. Louis, Mo., for debtor.

J. William Newbold, Dudley W. Von Holt, St. Louis, Mo., for Leach & Garner Co. and Leach & Garner Metals, Inc.

## ORDER

JAMES J. BARTA, Bankruptcy Judge.

At Saint Louis, in this District, this 9th day of August, 1991.

This matter concerns the Reorganized Debtor's objection to Proof of Claim No. 11, an unliquidated claim on behalf of Leach & Garner Company ("L & G"). Although the objection presents several areas for consideration, the parties have agreed to submit one issue for initial determination by the Court, with the understanding that further proceedings may be necessary. The question set out in the Parties' "Joint Stipulation of Material Facts and Issue Presented" is whether a $100,000.00 limitation of liability is valid against Leach & Garner (L & G). The parties have agreed to assume that, solely for the purpose of considering this limitation of liability issue, L & G has one or more valid claims against the Debtor.

Certain of the facts pertinent to this consideration have been agreed to in a joint stipulation filed on April 5, 1991. The Court's findings with respect to disputed facts are set out where appropriate in this Order.

The Debtor, SLT Warehouse, operated a field warehouse and collateral control business. At the request of certain lenders, SLT would monitor the inventory levels maintained on the premises of certain borrowers. Generally, these inventories had been pledged as collateral for loans of money or goods (in this case, 14-karat gold chain). L & G, a Massachusetts based precious metals company, was engaged in various aspects of the precious metals business, including financing and consignment of precious metals.

L & G had been supplying gold to Nest Company/International Chain Corporation ("Nest"), a jewelry wholesale company, through a consignment arrangement which provided a financing mechanism for Nest's gold chain operations. L & G's gold advances to Nest were collateralized in part by gold physically held on Nest's premises in a field warehouse.

In February of 1985, L & G selected the Debtor to operate a field warehouse on Nest's premises. The Debtor entered into a collateral control agreement with Nest whereby the Debtor was to monitor the amount of Nest's gold jewelry securing the L & G advances, advise of movement in and out of the field warehouse, and conduct monthly audits of the warehouse inventory. L & G and the Debtor further agreed that the Debtor would not be responsible for the quality of the finished gold chain product.

In October of 1985, after the Debtor lost its liability insurance because its insurer went out of business, L & G signed a letter agreement which established a $100,000.00 limitation of liability. A substantially similar agreement was signed by L & G on August 28, 1986. See Exhibits B and C, "Joint Stipulation of Facts and Issue Presented", received by the Clerk on April 5, 1991. In summary, the parties agreed that the Debtor's liability to L & G was not to exceed $100,000.00.

The Chapter 11 Petition was filed on May 16, 1989. The Debtor's Plan of Reorganization was confirmed on October 30, 1989.

L & G filed an amended proof of claim on November 30, 1989, based upon several theories. L & G has argued that as a result of the Debtor's actions after execution of the first letter agreement, the limitation of liability cannot be used as a defense to full payment of this claim.

In November, 1985, SLT advised Nest that certain of the finished gold inventory

was uncountable and unweighable, and that therefore, an accurate audit was impossible. It requested that Nest replace this inventory with a "more countable or weighable inventory." *See* "Joint Stipulation of Material Facts and Issue Presented", P. 6. Without SLT's knowledge, Nest replaced the inventory with nearly valueless gold colored chain. When the goods were exchanged, SLT did not issue a warehouse receipt or withdrawal slip to advise L & G of the movement of inventory in and out of warehouse inventory as it had done previously.

In late November or early December, 1985, L & G requested that SLT select random samples of Nest inventory and ship them to L & G for quality control testing. SLT agreed to perform this service even though it was outside the scope of its regular duties and it received no additional compensation. During the selection process SLT's auditor witnessed Nest's president, Robert Victor, switching one of the random samples. When confronted by the auditor and other SLT personnel, Victor explained that one of the samples which had been selected was not property which was to be used as collateral for L & G. He indicated further that he switched this sample because it was in fact collateral for transactions with a separate financing entity.

SLT investigated Victor's explanations and received what it believed to be verification of his story. Based upon this verification, SLT decided not to inform L & G of the switch. SLT returned the sample to Victor, selected another sample from inventory, and sent these samples to L & G.

Victor's substitution of fake gold for the precious metal inventory apparently continued for at least two years. He subsequently pleaded guilty to criminal charges and was sentenced to a Federal penal institution. He testified that he had acted alone in the commission of his various frauds, and that he had lied to SLT with respect to the incident involving the switched sample.

L & G argues that the terms of the limitation of liability agreement do not apply to its claims against the Debtor because the claims are based on negligence and fraud. L & G further argues that even if the limitation does apply here, the Debtor is estopped from asserting the limitation as a defense.

## THE AGREEMENT

■ The limitation agreement signed by L & G provided in pertinent part as follows:

In consideration of [the Debtor] agreeing to provide or continue to provide its inventory service to [L & G], at [L & G's] request for [Nest], [L & G] hereby agrees that [the Debtor's] liability to [L & G] arising out of the issuance by [the Debtor] of its Warehouse Receipts or Inventory Certificates to [L & G], and the operation of [the Debtor] of its Collateral Control Service for [Nest], shall be limited as hereinafter set out.

[The Debtor's] total liability for all claims of [L & G] at each location(s) operated for [Nest] shall not exceed the greater of (1) ten times the monthly storage rate per item lost, missing, or damaged, or (2) $100,000.00. Such limitation of liability is hereinafter referred to as "[the Debtor's] Maximum Liability."

[The Debtor] shall have absolutely no liability under any circumstances to [L & G] in excess of [the Debtor's] Maximum Liability.

■ This agreement is enforceable under Section 7–204(2) of the Uniform Commercial Code, which was enacted in Missouri at Section 400.7–204(2), R.S.Mo.1986. However, the Missouri statute carves out an exception to the operation of these types of agreements. No limitation of liability is possible "with respect to the warehouseman's liability for conversion [of the bailed goods] to his own use." Section 400.7–204(2), R.S.Mo.1986. A bailor must present proof that the warehouseman converted the goods for his own use. *Refrigeration Sales Co., Inc. v. Mitchell–Jackson, Inc.,* 575 F.Supp. 971, 977 (N.D.Ill, 1983), *aff'd* 770 F.2d 98 (7th Cir.1985); *Adams v. Ryan & Christie Storage, Inc.,* 563 F.Supp. 409, 414 (E.D.Pa.1983). In this case, there is no allegation that the Debtor converted the gold product to its own use. Thus, the Debtor is not prohibited by state statute

from asserting the terms of the limitation of liability agreement as a basis for its objection to the Creditor's claims.

■ The limitation of liability statute establishes minimum legal prerequisites for valid limitation agreements. L & G's argument that the entire agreement here is unenforceable because it may allow an amount greater than the "per unit" amount listed in the statute must be rejected. A warehouseman is not prohibited by the statute from agreeing to a more generous settlement than that referenced by law.

■ The language of the limitation of liability agreement is clear. The introductory paragraph of the agreement dated October 10, 1985 states that "the liability of SLT to you [L & G] out of the issuance by SLT of its Warehouse Receipts or Inventory Certificates to you, and the operation of its Collateral Control Service for Customer [Nest] shall be limited as hereinafter set out." *Joint Stipulation of Material Facts and Issue Presented,* Exhibit B, filed April 5, 1991. L & G argues that the limitation of liability should apply only to claims that arise directly out of the issuance of warehouse receipts or inventory certificates, and that its claims are based upon the Debtor's alleged misconduct in connection with taking samples of gold inventory. In the circumstances presented in this case, such a restrictive interpretation of the agreement is inappropriate. *See, Rhoden Investment Co. v. Sears, Roebuck and Co.,* 499 S.W.2d 375, 383 (Mo.1973). The Debtor's alleged misconduct arose from the operation of its collateral control service for Nest. L & G agreed that the Debtor's liability in these circumstances would be limited, and that "SLT shall have absolutely no liability under any circumstances to Holders [L & G] in excess of SLT's Maximum Liability...." The Debtor is not prohibited by the language of the agreement from using the limitation of liability as a basis for its objections to the L & G claims.

## ESTOPPEL

■ L & G has argued that the Debtor should be estopped from using the limitation of liability agreement because the Debtor had concealed the facts surrounding the switch of gold samples, the Debtor had not responded properly to Robert Victor's conduct, and because the Debtor had allegedly made misrepresentations concerning the samples sent to L & G. There is nothing in the record which suggests that at the time of these actions, the Debtor was aware of the fraudulent actions on the part of Mr. Victor. If the Debtor's actions were not undertaken with actual or constructive knowledge of the true state of facts, equitable estoppel cannot arise as a matter of law. *Inland Metals Refinery Co. v. Ceres Marine Terminal, Inc.,* 557 F.Supp. 344, 350 (N.D.Ill 1983).

L & G has argued that the "actual knowledge" referred to by the Court in *Inland Metals* should be applied to the Debtor's actual knowledge that the samples submitted were not random and that therefore, the Debtor is estopped from prosecuting the limitation of liability objection. In the circumstances presented here, the actual or constructive knowledge test must be applied to the fraudulent nature of the acts of Robert Victor, and not to the allegation that the Debtor knew or should have known that one of the samplings may not have been random. The Debtor's actions in investigating Victor's explanations, and in deciding to select another sample without informing L & G were entirely reasonable. Victor had convinced the Debtor that the switch was proper and that the switched metal was not intended to be a part of the random sampling group. The Debtor is justified in arguing that it was not aware that the samples were not random, and that it believed that the switch was proper under these circumstances.

## CONCLUSION

The stipulated facts have not described any indicent of intentional and malicious misrepresentation or concealment by the Debtor. Even if additional facts or evidence establish that the Debtor acted fraudulently or negligently, the parties are bound to the clear, valid language of the limitation of liability agreement. Therefore,

IT IS ORDERED that the Debtor's objection to the proof of claim filed on behalf of Leach & Garner Company and Leach & Garner Metals, Inc., Creditors, is SUSTAINED IN PART, in that should liability be established, the maximum total liability for all of these Creditors' claims against the Debtor in this case is limited to $100,000.00.