**In re STONE & WEBSTER, INCORPORATED, et al., Debtors.**

**The Shaw Group, Inc., Plaintiff,**

**v.**

**Next Factors, Inc., Defendant.**

**Bankruptcy No. 00–2142 PJW.**
**Adversary No. 01–6661 (PJW).**

United States Bankruptcy Court, D. Delaware.

Dec. 16, 2005.

Diane J. Bartels, Brandywine Village, Wilmington, DE, for Next Factors, Inc.

Christopher S. Sontchi, Joseph C. Handlon, Ashby & Geddes, PA, Wilmington, DE, for The Shaw Group, Inc.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

This ruling is with respect to the defendant's motion (Adv.Doc. # 65) for summary judgment in the above-captioned adversary proceeding. For the reasons set forth below, I will deny the motion.

## BACKGROUND

On September 25, 2001, The Shaw Group, Inc. ("Shaw") filed an Adversary Complaint for Declaratory Judgment seeking a determination as to (i) who is the proper owner of an unsecured claim in the amount of $125,358.99 (the "Xabeque claim") arising from the loss of a quantity of frozen shrimp by Shaw's predecessor warehouseman, and (ii) whether the owner of that claim is limited to a lesser amount by a warehouse receipt that capped the damages for the loss to $.50 per pound. By its answer, Next Factors, Inc. ("Next") asserted the affirmative defenses of waiver and estoppel. During the course of the proceedings, it became clear that Next was the sole and proper owner of the claim. As such, the remaining dispute centers on whether certain conduct by Shaw constitutes a waiver or estoppel which bars the objection to the amount of the Xabeque claim and if not, whether the warehouse receipt limitation is enforceable.

Next's brief sets forth four bases for its motion: (1) by reason of the Letter Agreement between Shaw and the Debtor whereby Shaw agreed to file claims objections by January 31, 2001, Shaw waived its right to object to the Xabeque claim because it filed the adversary complaint after January 31, 2001, (2) the claim is not limited by the limitation of liability set forth in the warehouse receipt, (3) by reason of the Letter Agreement and other actions, Shaw is estopped from objecting to the validity of the Xabeque claim, and (4) attorneys' fees and other pecuniary losses resulting from Next's claims litigation should be addressed in the bankruptcy case. Of course, the latter issue is mooted by rea-

son of the order entered on December 5, 2005 (Adv.Doc. # 88). The first and third bases are both premised on the timing provisions of the Letter Agreement, so I will address both of those points in the same discussion below. Finally, I will address the limitation of liability in the warehouse receipt.

## DISCUSSION

### Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).[1] Where the record could lead a reasonable trier of fact to find for the non-moving party, disposition by summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### Waiver and Estoppel

■ Both parties put forth numerous arguments relating to the timing provisions of the Letter Agreement and why it should or should not bar Shaw's complaint as to the Xabeque claim. However, I find that it is not necessary for me to address all those points because I believe certain pleadings and orders in the record before me clearly show that Shaw was entitled to

file objections to claims after January 31, 2001.

I believe the best way to address this issue is to simply recite major features of the relevant pleadings and orders as set forth below in chronological order.

(1) On January 30, 2001, Shaw filed The Shaw Group Inc.'s Omnibus Objection to Claims under 11 U.S.C. § 502(b) and Fed. R.Bankr.P. 3007 ("First Omnibus Objection") (NIBS Doc. # 1403; ECF Doc. # 1412). The claims objected to are set forth in two exhibits, Exhibit A and Exhibit B. Exhibit A identifies 490 claims aggregating $1,185,309,458.12. Exhibit B identifies 129 claims aggregating $80,605,841.33. Paragraph 21 of that motion contains the following statement of reservation of rights:

> Shaw expressly reserves the right to amend, modify or supplement this Objection, and to file additional objections to the claims or any other claims (filed or not) that may be asserted against Shaw. Should one or more of the grounds of objection stated in this Objection be overruled, Shaw reserves its rights to object to the proofs of claim on any other ground that bankruptcy and nonbankruptcy law permits.[2]

The proposed order attached to the motion contains the following statement in paragraph 4: "This Order is without prejudice to Shaw's right to object to any other proofs of claim or interests filed in these chapter 11 cases." [3]

---

1. Federal Rule of Civil Procedure 56(c) is applicable to matters in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7056.

2. Reservation of rights to assert additional substantive grounds for objections was common practice prior to this Court's adoption in September 2002 of Local Rule 3007–1(f)(iii) which provides that "[a]n Objection based on

substantive grounds shall include all objections on substantive grounds."

3. Local Rule 9013–1(e) requires that motions have attached thereto "a proposed form of order specifying the exact relief requested." The reason for that rule is obvious: the parties in interest must be informed as to whether the relief to be granted is consistent with the issues raised in the motion.

(2) Pursuant to Shaw's reservation of rights, on February 5, 2001, Shaw filed its Supplement to Exhibit A to the Shaw Group Inc.'s Objection to Claims Under 11 U.S.C. § 502(b) and Fed.R.Bankr.P. 3007 (NIBS Doc. # 1418; ECF Doc. # 1427). That supplement added seven claims aggregating $12,427.47 to the First Omnibus Objection.

(3) On February 12, 2001, Next filed a Response and Limited Opposition by Next Factors, Inc., to The Shaw Group Inc.'s Omnibus Objection (NIBS Doc. # 1443; ECF Doc. # 1452). That response identified five of Next's claims that were included in the First Omnibus Objection and noted that "Next is also the Transferee of a number of other claims that are not subject to the Order." That response then identified three specific claims as to which it opposed the First Omnibus Objection and then noted that "Next opposes the motion with respect to the claims held by Next." Next's response addressed no other issue raised by the First Omnibus Objection or the proposed order attached thereto.

(4) On February 28, 2001, Next, through its attorneys, filed a Response by Next Factors, Inc. to the Shaw Group, Inc.'s Omnibus Objection to Claims (Docket No. 1403) (NIBS Doc. # 1537; ECF Doc. # 1546). That response addressed only one of Next's claims, Claim No. 4564, D.M. Products Co., Inc., arguing that Shaw's basis for the objection was insufficient. Next also requested the Court to direct Shaw to make payment on 64 "Transferred Claims." The response addressed no other issue raised by the First Omnibus Objection or the proposed order attached thereto.

(5) On March 9, 2001, Shaw filed a Certification of No Objection Regarding Docket Item Nos. 1403 and 1418 (the "CNO") (NIBS Doc. # 1555; ECF Doc. # 1564).

This, of course, refers to the First Omnibus Objection. That certification attached a proposed order that in all material respects is the same as that attached to the First Omnibus Objection. The order identified the claims in Exhibits A, B and C thereto, with Exhibits A and B identifying claims to be expunged and Exhibit C identifying claims as to which objections were continued to a later hearing date. Paragraph 5 of the proposed order attached to the CNO states as follows: "This Order is without prejudice to Shaw's right to object to any other proofs of claim or interests filed in these chapter 11 cases." For reasons which are not clear from the record, Judge McKelvie did not immediately sign the order attached to the CNO.

(6) On April 17, 2001, Shaw filed The Shaw Group Inc.'s Second Omnibus Objection to Claims Under 11 U.S.C. § 502(b) and Fed.R.Bankr.P. 3007 (the "Second Omnibus Objection") (NIBS Doc. # 1648; ECF Doc. # 1657). That objection lists the objected to claims in Exhibits A and B. Exhibit A identifies 361 claims aggregating $93,062,817.99. The Xabeque claim (c/o Next Factors, Inc.) is listed in Exhibit A. Of the total of 361 claims, 79 (including the Xabeque claim) were objected to as "settled at closing." Exhibit B identifies 60 claims aggregating $21,950,239.09. As with the First Omnibus Objection, the Second Omnibus Objection contains (in paragraph 26) the same reservation of rights provision as follows:

> Shaw expressly reserves the right to amend, modify or supplement this Objection, and to file additional objections to the claims or any other claims (filed or not) that may be asserted against Shaw. Should one or more of the grounds of objection stated in this Objection be overruled, Shaw reserves its rights to object to the proofs of claim on

any other ground that bankruptcy and nonbankruptcy law permits.

As with the First Omnibus Objection, the Second Omnibus Objection likewise provides in paragraph 4 of the proposed order attached thereto as follows: "This Order is without prejudice to Shaw's right to object to any other proofs of claim or interests filed in these chapter 11 cases."[4]

(6) On May 16, 2001, Next filed a Response and Limited Opposition by Next Factors, Inc., To The Shaw Group Inc.'s Second Omnibus Objection To Claims (NIBS Doc. #1696; ECF Doc. #1705). The response identifies five specific Next claims, including the Xabeque claim, identified in the Second Omnibus Objection. Other than those particulars, the response simply states that "Next opposes the motion with respect to the claims held by Next." The response addresses no other point raised by the Second Omnibus Objection or the proposed order attached thereto.

(7) On May 22, 2001, Judge McKelvie held a hearing with respect to a number of matters. At the conclusion of the hearing, counsel for Shaw handed up a proposed order with respect to the Second Omnibus Objection and noted that notwithstanding Shaw's March 9, 2001 CNO, the order with respect to the First Omnibus Objection had not been signed by Judge McKelvie. Consequently, counsel also handed up a proposed order with respect to the First Omnibus Objection. Shaw's counsel pointed out that the form of orders handed up were revised from the forms that were attached to the objections.[5] Judge McKelvie signed both orders on May 22, 2001, granting the relief sought by the objections. According to the first omnibus order (NIBS Doc. #1711; ECF Doc. #1720), 441 claims aggregating $54,917,572.89 were expunged and objections to 176 claims aggregating $1,210,938,929.70 were continued for hearing at a later date. According to the second omnibus order (NIBS Doc. #1712; ECF Doc. #1721), 457 claims aggregating $112,130,119.90 were expunged and objections to 78 claims aggregating $19,792,296.54 were continued for hearing at a later date. Paragraph 5 of both orders contain the following reservation of rights: "This Order is without prejudice to Shaw's right to object to any other proofs of claim or interests filed in these chapter 11 cases, which right is expressly preserved."[6]

It is obvious that Next's waiver and estoppel arguments are in fundamental conflict with Judge McKelvie's two orders. Given the express reservation of right to object to other claims set forth in both of the omnibus objections to claims and in Judge McKelvie's orders resulting from

---

**4.** In the appendix to its summary judgment brief, Next brings to my attention numerous documents. Exhibit 8 of the appendix is a copy of the First Omnibus Objection. Exhibit 9 of the appendix is a partial copy of the Second Omnibus Objection. Notably absent from both of those documents in the appendix are copies of the proposed orders attached to the two objections as filed with the Court by Shaw.

**5.** I note from the transcript of the May 22, 2001 hearing that Next's attorney was in attendance at that hearing, albeit apparently in connection with a lift stay motion on behalf of another client.

**6.** This sentence contains a minor revision to the sentence in the proposed orders attached to the objections. However, the revision of this sentence, by adding the phrase "which right is expressly preserved" to the end of it, serves only to emphasize what I view as the clear meaning of the sentence as it appeared in the proposed orders attached to both objections, namely, Shaw has the right to file objections to claims not identified in the objection to which the order relates.

those objections, I am at a loss to understand how Next could seriously argue that the time provisions in the Letter Agreement bar Shaw from filing objections to claims after January 31, 2001.[7] Of course, as evidenced by Next's filing of two responses to the First Omnibus Objection, it is clear that Next was specifically put on notice of Shaw's reservation of rights to object to other claims and to object to claims on additional grounds.

In its answering brief, Shaw presents a number of arguments as to why the provisions of the Letter Agreement do not constitute some type of statute of limitations or bar date that gives rise to a waiver or estoppel defense. I am persuaded by those arguments. However, I need not recite them here because I find that the undisputed record as discussed above presents a more convincing reason why Next's waiver and estoppel arguments have no merit. I make two final points in regard to this issue:

■ (1) Neither by statute or rule is there a deadline for objecting to claims. Presumably, the closing of the case may be deemed such a deadline. Unless a claim objection deadline is addressed in the confirmed plan in the Stone & Webster chapter 11 case, I know of nothing in the record of the chapter 11 case that would bar Shaw from filing further objections to claims, other than, at this late date, a laches defense.

(2) Given the complexity of the sale transaction by which Shaw assumed hundreds of separate liabilities aggregating hundreds of millions of dollars in a case with up to 5,000 proofs of claim, had claims been deemed allowed by default after January 31, 2001, Shaw would have had a good

argument for reconsideration relief as provided by Code § 502(j) and Rule 3008.

Before addressing the issue of the limitation of liability in the warehouse receipt, I comment briefly on Next's argument on the alleged August 6, 2001 "stipulation". In my ruling from the bench on May 23, 2003, I thought I made it clear that there was no stipulation to enforce. Consequently, I do not understand why Next persists in mischaracterizing the record on this issue. If Next believes it needs a written order on that ruling, so that it can take an appeal, then it should present an appropriate order for me to sign.

*Limitation of Liability in the Warehouse Agreement*

■ The final issue here is whether Next's claim is capped by a warehouse receipt, which provides that claims for the lost frozen shrimp shall not exceed $.50 per pound. Georgia law governs the transaction. Under that state's law, a warehouse receipt may validly cap damages for loss. But any such limitation is ineffective if the warehouseman converted the property for his own use. The relevant statute reads as follows:

(1) A warehouseman is liable for damages for loss of or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful man would exercise under like circumstances but unless otherwise agreed he is not liable for damages which could not have been avoided by the exercise of such care.

(2) *Damages may be limited by a term in the warehouse receipt* or storage agreement limiting the amount of liability in case of loss or damage, and setting forth a specific liability per article or item, or value per unit of weight, beyond

7. So far as I am aware, no claim holder identified in the Second Omnibus Objection, other than Next, has raised the issue of waiver or estoppel in the manner argued by Next.

which the warehouseman shall not be liable; provided, however, that such liability may on written request of the bailor at the time of signing such storage agreement or within a reasonable time after receipt of the warehouse receipt be increased on part or all of the goods thereunder, in which event increased rates may be charged based on such increased valuation, but that no such increase shall be permitted contrary to a lawful limitation of liability contained in the warehouseman's tariff, if any. *No such limitation is effective with respect to the warehouseman's liability for conversion to his own use.* (3) Reasonable provisions as to the time and manner of presenting claims and instituting actions based on the bailment may be included in the warehouse receipt or tariff.

GA. CODE ANN. § 11–7–204 (2005) (emphasis added).

As the statute demonstrates, a warehouseman is liable for a loss to goods caused by his failure to exercise such care as a reasonably careful person would under the circumstances. GA. CODE ANN. § 11–7–204(1) (2005). Damages may validly be limited by a term in the warehouse receipt, however. GA. CODE ANN. § 11–7–204(2) (2005); *see, e.g., Sun Valley, Inc. v. Southland Bonded Warehouse, Inc.*, 171 Ga.App. 233, 319 S.E.2d 91, 92–93 (1984) (holding that a limitation clause validly limited the bailor's claim of negligence against the warehouseman for missing goods).

In this case, the warehouse receipt provides as follows:

If goods are damaged or lost through negligence of the warehouseman, the lesser of reasonable wholesale market price of storer's cost at Atlanta, Georgia of the goods on the date of discovery of damage or loss shall be the measure of damages, but in no case shall the liability of the warehouseman exceed fifty cents (50 cents) per pound unless excess value is declared by the storer at the time the goods are stored.

(Adv.Doc. # 72, p.21). Next seeks to avoid the consequences of this limitation by asserting that there was a conversion rather than negligence. Georgia's Uniform Commercial Code clearly states that "[n]o such limitation is effective with respect to the warehouseman's liability for conversion to his own use." GA. CODE ANN. § 11–7–204(2) (2005). Thus, if Next is successful on its assertion that the warehouseman converted the property to his own use, the warehouse receipt's limitation will not apply; but if Next is successful on a claim of only negligence, then the limitation on damages will be effective.

■ At this stage, Next does not point to any facts that would demonstrate that the warehouseman converted the frozen shrimp for its own use. (Adv.Doc. 66, p. 21). Indeed, Next states that it does not even know whether the frozen shrimp was "lost or stolen." (Adv.Doc. 66, p. 21). Clearly, someone who negligently misplaces a product is not liable for conversion. 8A AM. JR. 2D BAILMENTS § 74. Nonetheless, Next asserts that this Court aught to presume a conversion on the part of the warehouseman. (Adv.Doc. 66, p. 21). To come to this result, Next erroneously relies on a Georgia statute dealing with the burden of proof as to diligence in a bailment relationship.[8] That statute reads, in full, as follows:

---

8. It is well settled that "[t]he entrustment of goods to a warehouseman pursuant to a contract creates a bailment." *South Georgia Pe-* *can Co. v. Alimenta Processing Corp.*, 195 Ga. App. 688, 394 S.E.2d 545, 547 (1990).

In all cases of bailment, after proof of loss by the bailor, the burden of proof is on the bailee to show proper diligence. Next concludes that the burden of proving that a loss of goods was not a conversion rests on the warehouseman. As is clear, the statute does not mention the word "conversion" or "intentional tort". Rather, the statute creates only a presumption of negligence on the part of the bailee.

A look at related Georgia statutes confirms this result. Specifically, Georgia Code Section 44–12–43 states that "[a]ll bailees are required to exercise care and diligence to protect the thing bailed and to keep it safe. Different degrees of diligence are required according to the nature of the bailments." GA. CODE ANN. § 44–12–43 (2005). In this case, the degree of diligence is one of "ordinary care and diligence" because the warehouse is a depository for hire. See GA. CODE ANN. § 44–12–92 (2005).[9]

■ Thus, Georgia law makes clear that once a bailor shows proof of loss, the burden of proving ordinary care and diligence is on the warehouseman. GA. CODE ANN. § 44–12–44 (2005). "This burden on the bailee is regarded as a presumption of negligence, a rebuttable inference, thus requiring him to produce evidence of care and diligence to negate the presumption." Pastis v. Cobb Exch. Bank, 142 Ga.App. 519, 236 S.E.2d 279, 281 (1977). Negligence, however, is not the same as conversion. Southern Express Co. v. Sinclair, 130 Ga. 372, 60 S.E. 849, 849 (1908) ("A plaintiff cannot sue for a conversion and recover by proving that there was no conversion, but at most negligence ....."); Wood v. Frank Graham Co., 91 Ga.App. 621, 86 S.E.2d 691, 693–94 (1955)("[H]ere the plaintiff does not seek damages for the failure of the defendant to use ordinary care with respect to the bailed property, that is, that the defendant is guilty of nonfeasance; but seeks to recover for a tortious conversion, a malfeasance."); Shore v. Brown, 19 Ga.App. 476, 91 S.E. 909 (1917)(stating that in an action alleging conversion "[t]here must be some act of malfeasance, not mere nonfeasance, some positive wrong and not the mere omission of what is right. Mere neglect of duty will not support an action of trover."); see 8A AM. JR. 2D BAILMENTS § 78 ("Conversion will not result from a failure or refusal to return bailed property which results solely from the inability of the bailee to make delivery, as where the subject matter has been destroyed, stolen, or otherwise lost other than by an intentional act of the bailee which would itself amount to conversion."); 8A AM. JR. 2D BAILMENTS § 74 ("The mere fact that the bailed item is lost does not make the bailee liable to the bailor [for conversion], since the bailee is not an insurer; however, the bailee can be held liable for loss of the item bailed in an action for negligence.").

■ Thus, the Georgia statute that creates a rebuttable presumption of negligence, does not thereby create a rebuttable presumption of conversion.

Next, however, does not solely rely on the Georgia statute. Rather, Next also relies on three Georgia cases for the prop-

9. "Depositories for hire are bound to exercise ordinary care and diligence and are liable as in other cases of bailment for hire." GA. CODE ANN. § 44–12–92 (2005). Under Section 44–12–90 of the Georgia Code, a "Depository for hire" means "a depository who receives or expects a reward or hire for undertaking to keep chattels for another." A warehouseman falls within this definition, Millender v. Loop-

er, 82 Ga.App. 563, 61 S.E.2d 573, 577 (1950) (decided under former law); thus, a warehouseman must exercise ordinary care and diligence to protect the thing bailed. See, e.g., Harper Warehouse., Inc. v. Henry Chanin Corp., 102 Ga.App. 489, 116 S.E.2d 641, 648 (1960) (decided under former law); Washburn Storage Co. v. Mobley, 94 Ga.App. 113, 94 S.E.2d 37, 37 (1956) (same).

osition that conversion should be presumed. All three of these decisions, however, do not say anything more than the above stated rule that negligence is presumed on the part of a bailee who fails to redeliver goods. *See South Georgia Pecan Co. v. Alimenta Processing Corp.*, 195 Ga. App. 688, 394 S.E.2d 545, 548 (1990); *Harper Warehouse., Inc. v. Henry Chanin Corp.*, 102 Ga.App. 489, 116 S.E.2d 641, 646 (1960); *Washburn Storage Co. v. Mobley*, 94 Ga.App. 113, 94 S.E.2d 37, 37 (1956). In Next's own words, *South Georgia Pecan* held that a "warehouseman [was] presumed negligent upon [a] showing of damage and [the] burden shifts to [the] warehouseman to show he exercised due diligence." Likewise, Next states that in *Harper Warehouse*, the "warehouseman [was] required to show [he] · exercised proper diligence . . . ." Finally, Next notes that in *Washburn Storage*, the "warehouseman had [the] burden of showing he exercised ordinary care . . . ." (Adv.Doc. # 66, p. 23).

A presumption of negligence, a requirement that the warehouseman show proper diligence, and a placement of the burden of showing ordinary care on the warehouseman, do not require this Court to presume a conversion on the part of the warehouseman. Taken together, these authorities confirm that negligence is rebuttably presumed. But none of the three cited cases even mentions conversion. Thus, none of

the three referenced cases provide guidance on whether Georgia would place the "burden of proving that an unexplained loss was not a conversion for the warehouseman's own use [ ] on the warehouseman," as Next suggests. (Adv.Doc. # 66, p. 23).

Further, the cases that Next cites that are directly on point generally hold the opposite of what Next asserts. *See, e.g., Adams v. Ryan & Christie Storage Inc.*, 563 F.Supp. 409, 414 (E.D.Pa.1983) (applying Pennsylvania law and concluding that conversion cannot be presumed); *Inland Metals Ref. Co. v. Ceres Marine Terminals, Inc.*, 557 F.Supp. 344, 348–49 (N.D.Ill.1983) (applying Indiana law and concluding that negligence but not conversion is presumed); *Sanfisket, Inc. v. Atl. Cold Storage Corp.*, 347 So.2d 647, 648–49 (Fla.App.1977) (applying Florida law and holding that conversion could not be presumed). The only case cited by Next that supports its position is *I.C.C. Metals, Inc. v. Municipal Warehouse Co.*, 50 N.Y.2d 657, 431 N.Y.S.2d 372, 409 N.E.2d 849 (1980), which held that under New York law a conversion was presumed on the part of the bailee. Next has pointed to no Georgia authority that would suggest that Georgia would adopt the minority rule articulated in *I.C.C. Metals.*[10]

With no relevant Georgia decision before me, I cannot infer that Georgia would

---

10. As stated by the Fifth Circuit, the *I.C.C. Metals* approach is a minority position. *Int'l Nickel Co. v. Trammel Crow Distrib. Corp.*, 803 F.2d 150, 154 (5th Cir.1986) (rejecting the *I.C.C. Metals* approach under Texas law). Many other jurisdictions supports the rejection of the *I.C.C. Metals'* presumption of conversion. *See, e.g., Refrigeration Sales Co., Inc. v. Mitchell–Jackson, Inc.*, 770 F.2d 98, 102 (7th Cir.1985) (Illinois law); *Ferrex Int'l, Inc. v. M/V Rico Chone*, 718 F.Supp. 451, 460 (D.Md.1988) (Maryland law); *Nippon Fire & Marine Ins. Co. v. Holmes Transp., Inc.*, 616 F.Supp. 610, 612 (S.D.N.Y.1985)(federal common law); *W. Mining Corp. v. Standard Ter-*

*minals, Inc.*, 577 F.Supp. 847, 851 (W.D.Pa. 1984) *aff'd without opinion* 745 F.2d 49 (3d Cir.1984) (Pennsylvania law); *Inland Metals Ref. Co. v. Ceres Marine Terminals, Inc.*, 557 F.Supp. 344, 348–49 (N.D.Ill.1983) (Indiana law); *In re SLT Warehouse Co.*, 130 B.R. 79, 81 (Bankr.E.D.Mo.1991) (Missouri law); *Lerner v. Brettschneider*, 123 Ariz. 152, 598 P.2d 515, 518 (1979) (Arizona law); *Sanfisket, Inc. v. Atl. Cold Storage Corp.*, 347 So.2d 647, 648–49 (Fla.App.1977) (Florida law); *see also* Va. Code Ann. § 8.7–204 (2005) (rejecting, in its official comment, the holding of the *I.C.C. Metals* case); Ala.Code § 7–7–204 (2005)

adopt the minority rule. In rejecting *I.C.C. Metals*, the Fifth Circuit has stated that "[w]e are hesitant, in determining state law in a diversity case, to adopt a rule not shared by a majority of courts." *Int'l Nickel Co., Inc., v. Trammel Crow Distrib. Corp.*, 803 F.2d 150, 154 (5th Cir. 1986). The Fifth Circuit also went on to note that "while presuming negligence is entirely reasonable when a bailee fails to deliver goods it has contracted to store in its warehouse, presuming in every case in which a limitation of liability clause exists that the bailee has intentionally and wrongfully converted the goods to his own use is not so reasonable and arguably imposes an undue burden on the bailee." *Id.*

## CONCLUSION

For the foregoing reasons, Next's summary judgment motion is denied.

(same); Idaho Code Ann. § 28–7–204 (2005) (same). *But see Joseph H. Reinfeld, Inc. v. Griswold & Bateman Warehouse Co.*, 189 N.J.Super. 141, 144–45, 458 A.2d 1341 (1983) (adopting the holding of *I.C.C. Metals* under New Jersey law).